AMY TOTENBERG, UNITED STATES DISTRICT JUDGE
*1241 They say that "breaking up is hard to do;" it leaves your "heart in misery."[1] And Tammy Wynette says "D-I-V-O-R-C-E" is "H-E double L," as she sings:
I spell out all the hurtin' words
And turn my head when I speak
'Cause I can't spell away this hurt
That's drippin' down my cheek.[2]
This action brought pursuant to the Employee Retirement Income Security Act ("ERISA") asks this Court to say whether divorceé Plaintiffs Patricia Giering and Nancy Parin are entitled to benefits under their ex-husbands' retirement plans.
It is before the Court on Plaintiffs' Motion for Partial Summary Judgment [Doc. 87], Defendant's Cross-Motion for Partial Summary Judgment [Doc. 93], Plaintiffs' Conditional Rule 56(d) Motion (to Defer Ruling on the Pending Summary Judgment Motions) [Doc. 106], and Defendant's Motion to Strike certain amendments to Plaintiffs' Second Amended Complaint [Doc. 90].
I. INTRODUCTION
Plaintiffs filed this ERISA class action on behalf of themselves and former participants in NCR Corporation's "top hat" retirement plans.[3] Plaintiffs are former NCR executives or spouses of executives who participated in one of NCR's nonqualified retirement plans. These plans allegedly promised NCR executives that upon retirement they would receive monthly or bi-weekly annuity payments for the remainder of their lives and provided for surviving "eligible" spouses to be paid a portion of participants' annuities following the participants' death.
According to Plaintiffs, NCR improperly terminated the Plans to avoid making annuity payments. Instead, NCR paid out benefits in lump sums to plan participants, reducing the benefits plan participants would have received over the life of their annuity. NCR also adopted an interpretation of "Eligible Spouse" contrary to the plan language to exclude from benefits those spouses who were married to the participants when their plans commenced but got divorced before NCR terminated the plans. Plaintiffs filed suit against the Plan Administrator of the Plans of NCR Corporation[4] challenging (1) the alleged improper termination of the plans in Count *1242 I, (2) the alleged improper use of a discount rate to calculate lump sum payments that were not actuarially equivalent to their annuities in Count II, and (3) the alleged improper interpretation of the plan to require that "Eligible" spouses be married to plan participants when NCR terminated the plans in Count III.
The parties have each moved for summary judgment on Count III of Plaintiffs' Second Amended Complaint that challenges Defendant's interpretation of "Eligible Spouses" to deny benefits to spouses who were married to participants on the date benefits commenced but who had divorced prior to the date of termination of the plans. Plaintiffs seek judgment in their favor on the question whether they are "eligible spouses" under the terms of NCR's Senior Executive Retirement Death and Disability Plan ("SERP"), and therefore are entitled to a spousal benefit under the SERP. Defendant has cross-moved, seeking judgment in its favor, asserting that Plaintiffs failed to exhaust administrative remedies as required before asserting their claim in Count III in this Court.
II. PROCEDURAL BACKGROUND
Plaintiffs originally brought this action as a putative class action on behalf of former plan participants and spouses. The only named plaintiffs were plan participants. No spouses were named as plaintiffs in the original complaint. In response to Defendant's first motion to dismiss, the Court dismissed Plaintiffs' claim in Count III without prejudice for lack of standing because the original complaint contained no allegations from which the Court could reasonably infer that Plaintiffs - as opposed to their "eligible" spouses, or ex-spouses - suffered a cognizable injury as a result of NCR's elimination of the accrued benefits of spouses who were married to participants when benefits commenced under the plans, but who divorced participants prior to the plan termination and payment of lump sums. (Doc. 26 at 38, citing Compl. ¶ 106.) Because the Plan participants are not the beneficiaries of the spousal death benefit survivor annuity under the express terms of the Plans at issue, the Court noted that "Section 1132(a)(1)(B) would not provide Plaintiffs Hoak, Fano, and Quick the right to assert a claim as to those benefits but would provide their 'Eligible Spouses' with a statutory cause of action as to their right to those benefits." (Id. at 31.) The Court allowed Plaintiffs to file an amended complaint.
In response to the Court's Order, Plaintiffs filed an Amended Complaint adding a claim for spousal benefits on behalf of Patricia Giering, the former spouse of an NCR executive, as a named Plaintiff. Defendant moved to dismiss Patricia Giering's claim in Count III of the Amended Complaint on the basis that she had failed to exhaust her administrative remedies. Defendant contended that (1) Patricia Giering never filed a claim with the Plan Administrator seeking payment of spousal benefits, and (2) her former spouse John Giering (in seeking the payment of an additional benefit for himself) did not purport to bring a claim for benefits on Patricia Giering's behalf as her authorized representative.
The Court denied the Defendant's motion, finding evidence in the administrative record indicating that: (a) John Giering, who made a claim for benefits also asserted Patricia Giering's rights to her vested interest in the spousal death benefits in the form of a lump sum payment upon termination of the plan, (b) the Plan Administrator interpreted John Giering to make such a claim, and (c) the Plan Administrator expressly made a determination *1243 that Patricia Giering, as John's former spouse, was not entitled to the benefits because she was not an "Eligible Spouse" under its interpretation of the Plan language. The Plan Administrator never asked whether John Giering was authorized as Patricia's representative to assert a claim to benefits on her behalf and never asked John Giering to submit a written authorization prior to making its determination of Patricia Giering's "eligible spouse" status and denying her entitlement to the benefit. To the extent Patricia Giering was herself required to separately pursue an administrative claim as to her eligibility for post-termination plan benefits, the Court found that such an endeavor would be futile under the circumstances presented here and that Patricia Giering was therefore excused from ERISA's exhaustion requirement with respect to the eligible spouse claim. (Order, Doc. 70 at 13-14.)
Plaintiffs moved for class certification of their claims. The Court granted Plaintiffs' motion to certify a class and subclass with respect to Counts I and II, but denied the motion to certify a class with respect to Count III - the eligible spouse claim. The Court found that class certification of Count III was not appropriate in light of the information presented by Defendant, unchallenged by Plaintiffs, that only two former spouses, Patricia Giering and Nancy Parin, were denied benefits based on Defendant's interpretation of the "Eligible Spouse" Plan language. The Court therefore allowed Plaintiffs to amend their complaint to add Nancy Parin, Plaintiff Allan Quick's ex-wife, to join as a named plaintiff along with Plaintiff Giering for adjudication of their individual claims. (Order, Doc. 83 at 30-31.)
The day after filing their Second Amended Complaint to assert the eligible spouse claim on behalf of Nancy Parin, Plaintiffs Giering and Parin moved for summary judgment on Count III seeking a declaration that Defendant's interpretation of the term "eligible spouse" is invalid and that they are entitled a spousal benefit under SERP.
III. Defendant's Motion to Strike Portions of the Second Amended Complaint
Defendant has filed a Motion to Strike Certain Unauthorized Amendments to Plaintiffs' Second Amended Class Action Complaint [Doc. 90]. Defendant asserts that Plaintiffs were granted a limited right of amendment only "to add Quick's former spouse to pursue claims as an eligible spouse," but the Second Amended Complaint "made numerous additional allegations and requests for relief, including some concerning issues having nothing to do with spousal claims." (Def.'s Mot. to Strike at 1-2.) Defendant notes that it "consents to and will answer, most of the additional alterations made by Plaintiffs. Defendant does not consent, however, to the several changes that Plaintiffs have made seeking to alter and expand the Complaint's request for relief concerning non-spousal claims." (Id. at 2.) Because Plaintiffs were required to seek permission for these amendments "which are highly objectionable at this point in the litigation, after a class has already been certified," Defendant requests that the Court strike the additions that Plaintiffs have "improperly made to paragraph 6 of the Second Amended Complaint and to the Prayer for Relief." (Id. )
While the Prayer for Relief is a repeat of Paragraph 6, for ease of discussion, a red-lined version of both Paragraph 6 and the Prayer for Relief are shown below:
*1244 5.6. As set forth below, the Court should:
(a) Certify this case as a class action under Fed. R. Civ. P. 23(b)(1) and (b)(2);
(b) Declare that NCR breached its agreements with plaintiffs by terminating the trusts and eliminating the trustee as the final arbiter of claims for benefits;
(c) Declare that NCR breached its agreements with plaintiffs by terminating the plans and paying lump sums that were not actuarially equivalent to the annuities they were promised in the plans:
(d) Declare that NCR's use of a flat 5% discount rate to discount the value of participants' and spouses' benefits was contrary to the plans and unreasonable;
(de) Declare that NCR's interpretation of the terms `Spouse' and `Eligible Spouse' is contrary to the plans and unreasonable;
(ef) Declare that the plans required NCR to pay participants and spouses lump sums calculated using the applicable discount rates *1245 under § 417(e) of the IRS Code or such other rate(s) as the Court finds appropriate;and
(fg) Order NCR to pay participants and, their eligible spouses aand beneficiaries lump sums reflecting the difference between what NCR has already paid and what they are required to pay under the Court's declarations-: and
(gh) Order NCR to pay plaintiff's attorneys' fees and costs under the terms of the plans, or such other legal basis as the Court deems appropriate.
(iv) Declare that NCR's use of a 5% discount rate to discount the value of participants' and spouses' benefits was contrary to the plans and unreasonable;
(ivv) Declare that the plans required NCR to use the applicable § 417(e) rates, or such other rate(s) as the Court finds appropriate:
(vvi) Declare that NCR's interpretation of the terms `Spouse' and `Eligible Spouse' as requiring that spouses be married to a participants both at the time benefits commenced and when the plans were terminated is contrary to the plans:
WHEREFORE, plaintiffs pray for the following relief:
(i) Certify this case as a class action under Fed. R. Civ. P. 23(b)(1) and (b)(2), appoint the named plaintiffs as class representatives and their attorneys as class counsel;
(ii) Declare that NCR breached its agreements with plaintiffs by terminating the trusts and eliminating the trustee as the final arbiter of claims for benefits;
(iii) Declare that NCR breached its agreements with plaintiffs by terminating the plans and paying lump sums that were not actuarially equivalent to the annuities they were promised in the plans:
(vivii) Order NCR to pay participants and their eligible spouses and beneficiaries a lump sum reflecting the difference between what NCR has already paid and what they are required to pay under the Court's declarations;
*1246 (viii) Order NCR to pay pre-judgment and post-judgment interest;
(viiiix) Order NCR to pay reasonable attorneys' fees and costs pursuant to the plans and/or award fees pursuant to the common benefit doctrine, or any other applicable law; and
(ixx) Order such other relief as this Court finds appropriate.
(Ex. A to Def.'s Mot., Doc. 90-1.)
In response, Plaintiffs admit that in addition to adding Nancy Parin as a named Plaintiff for Count III in the Second Amended Complaint, Plaintiffs made other small edits, but assert that the additions add nothing substantive to and are not inconsistent with prior versions of their complaint or their administrative claims. (Pl.'s Resp., Doc. 91 at 2.) Plaintiffs contend that they "have added no new claims, theories or factual allegations, unrelated to the spousal claim the Court gave plaintiffs leave to amend." (Id. at 4.) Other than its general assertion that the changes are "highly objectionable," Plaintiffs complain that Defendant has failed to explain how the amendments are prejudicial.[5]
As Plaintiffs' amendments do not appear to add anything materially different to the existing claims and Defendant's Motion seeks unnecessarily to elevate form and procedure over substance, the CourtDENIES Defendant's Motion to Strike [Doc. 90].
IV. FACTUAL SUMMARY[6]
The NCR Senior Executive Retirement, Death and Disability Plan ("SERP") is an IRS nonqualified "top hat" plan. (Def.'s Resp. to Pls.' SMF ¶ 1.) The SERP provided a death benefit/survivor annuity for the "Eligible Spouse" of participants. (Pls.' SMF ¶ 2.) The Plan provides, in relevant part, that "[i]n the event of the death of a former Participant after retirement or termination of employment with NCR ..., such Participant's Eligible Spouse shall be entitled to benefits under the Plan in an annual amount," as calculated under the terms of the Plan based on various circumstances. (See SERP (2008), Art. IX § 2, Doc. 34-2 at 26; SERP (2013 Restatement), Art. IX § 2, Doc 34-2 at 46.) Article IX of SERP provides that the "spouse's benefits under the Plan shall be paid in equal installments at least annually commencing at the date of death [of the participant] for the life of the Eligible Spouse." (Id. at 27, 47.) The SERP defines "Eligible Spouse" as "the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence."
(Ex. A to Def.'s Mot., Doc. 90-1.)
In response, Plaintiffs admit that in addition to adding Nancy Parin as a named Plaintiff for Count III in the Second Amended Complaint, Plaintiffs made other small edits, but assert that the additions add nothing substantive to and are not inconsistent with prior versions of their complaint or their administrative claims. (Pl.'s Resp., Doc. 91 at 2.) Plaintiffs contend that they "have added no new claims, theories or factual allegations, unrelated to the spousal claim the Court gave plaintiffs leave to amend." (Id. at 4.) Other than its general assertion that the changes are "highly objectionable," Plaintiffs complain that Defendant has failed to explain how the amendments are prejudicial.[5]
As Plaintiffs' amendments do not appear to add anything materially different to the existing claims and Defendant's Motion seeks unnecessarily to elevate form and procedure over substance, the Court DENIES Defendant's Motion to Strike [Doc. 90].
IV. FACTUAL SUMMARY [6]
The NCR Senior Executive Retirement, Death and Disability Plan ("SERP") is an IRS nonqualified "top hat" plan. (Def.'s Resp. to Pls.' SMF ¶ 1.) The SERP provided a death benefit/survivor annuity for the "Eligible Spouse" of participants. (Pls.' SMF ¶ 2.) The Plan provides, in relevant part, that "[i]n the event of the death of a former Participant after retirement or termination of employment with NCR ..., such Participant's Eligible Spouse shall be entitled to benefits under the Plan in an annual amount," as calculated under the terms of the Plan based on various circumstances. (See SERP (2008), Art. IX § 2, Doc. 34-2 at 26; SERP (2013 Restatement), Art. IX § 2, Doc 34-2 at 46.) Article IX of SERP provides that the "spouse's benefits under the Plan shall be paid in equal installments at least annually commencing at the date of death [of the participant] for the life of the Eligible Spouse." (Id. at 27, 47.) The SERP defines "Eligible Spouse" as "the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence."
*1247 (Def.'s Resp. to Pls.' SMF ¶ 3; SERP, Art. I, Doc 34-2 at 22, 40.)
Patricia Giering is the former spouse of John Giering. (See Def. Resp. to Pls.' SMF ¶ 7.) John L. Giering was a senior executive at NCR. (Id. ) He retired from NCR in 1998. (Id. ) Patricia Giering was married to John Giering on September 1, 1995, the day that his benefits under SERP commenced. (Id. ) John and Patricia Giering divorced in 2002. (Pls.' Resp. to Def.'s XSMF ¶ 2; Def.'s Resp. to Pls.' SMF ¶ 7.)
Nancy Parin is the former spouse of Allan Quick. (See Doc. 23-1, Allan Quick and Nancy Parin Divorce Decree and Settlement Agreement; Defs.' XSMF ¶ 3.) Allan Quick was a senior executive at NCR. (Pls.' Resp. to Def.'s XSMF ¶¶ 1.) He retired from NCR on January 31, 1995 and his retirement benefits commenced on February 1, 1995. (Id. ; Ex. 1 to Jacobs Decl.) Nancy Parin was married to Allan Quick when he retired from NCR and his benefits commenced, but the couple subsequently divorced on November 28, 1995.[7] (See Parin Decl. ¶ 1; Final Judgment and Decree, Doc. 23-1; see also Def.'s XSMF ¶ 12 (implicitly acknowledging that as of February 23, 2013, Allan Quick was no longer married to the spouse to whom he was married on the date his benefits commenced); Pls.' Resp. ¶ 12.)[8] Prior to his marriage to Nancy Parin, Allan Quick was married to Theresa Quick. Allan and Teresa divorced prior to his retirement from NCR.
Patricia Giering did not file a claim with the NCR Plan Administrator for spousal benefits personally on her own behalf. (See Pls.' Resp. to Def.'s XSMF ¶ 15.) Nancy Parin did not file a claim with the NCR Plan Administrator for spousal benefits personally on her own behalf. (See Pls.' Resp. to Def.'s XSMF ¶ 19.)
On February 25, 2013, NCR terminated the SERP and several other nonqualified plans. (Def.'s Resp. to Pls.' SMF ¶ 17.) NCR retained the right to amend, modify or terminate the SERP, "provided, however, that no such action shall adversely affect any Participant's, former Participant's or Eligible Spouse's accrued benefits prior to such action under the Plan or the benefits payable under [the change in control provisions of] Article XIII." (Def.'s Resp. to Pls.' SMF ¶ 9; SERP Art. XII.)
After NCR approved termination of the SERP, NCR calculated the value of lump sum payments including the spousal benefits, and sent statements to Plan participants including John Giering and Allan Quick. (Def.'s Resp. to Pls.' SMF ¶ 18; Pls.' Ex. C, Doc. 88-3, Plan Statement for John Giering; Pls.' Ex. D, Doc. 88-4, Plan Statement for Allan Quick.) NCR notified John Giering in a letter dated March 15, 2013 that he would receive a lump sum payment. (Pls.' Ex. C, Doc. 88-3.) NCR further advised Giering that he may be entitled to *1248 an additional lump sum of $474,401.95 in connection with his joint and survivor annuity. (Id. ; Def.'s Resp. to Pls.' SMF ¶ 19.) NCR's Plan Statement for John Giering explains:
You May be Entitled to an Additional Lump Sum Payment
If you meet certain criteria, you are eligible to receive an additional lump sum payment. You must meet the eligibility criteria as follows:
• You were married at the time of your benefit commencement date
• You are receiving a joint & survivor annuity form of payment
• You are still married to the same spouse as you were at the time of your benefit commencement date
If you meet all of the criteria listed above and we confirm your eligibility, you will receive an Additional Lump Sum Payment (before taxes) as follows:
Additional Lump Sum Payment
Additional Lump Sum Payment (before withholding for taxes) $533,370.27 Less: Additional Lump Sum Value of Offsets ($58,968.32) Net Additional Lump Sum Payment (before withholding for taxes) $474,401.95
In order for us to confirm that you are eligible for the Additional Lump Sum Payment, you must do the following:
• Complete the Payee Information Verification Form
• Have your signature and (if applicable) your spouse's signature notarized by a Notary Public
• Mail the completed form in the postage paid envelope postmarked no later than May 17, 2013 to:
NCR SERP Service Center 3097 Satellite Btvd. Duluth, GA 30096
• For purposes of the Lump Sum Payment, we have assumed that you and your beneficiary spouse do not together have children under the age of 22 as of February 25, 2013. In certain circumstances, this may increase the value of your benefit. If you have children under age 22, please contact the NCR SERP Service Center at 1-800-785-1403.
(Exhibit C, Doc. 88-3 at 5.) NCR did not send any such letter to Patricia Giering. (Def.'s Resp. to Pls.' SMF ¶ 19.)
NCR sent Plaintiff Allan Quick an identical letter notifying him of his lump sum payout and that he may be entitled to an additional lump sum of $244,844.22 in connection with his joint & survivor annuity. (Def.'s Resp. to Pls.' SMF ¶ 20.) NCR did not send any such letter to Nancy Parin. (Id. )
Along with the letters sent to Giering and Quick, NCR attached a Payee Information Verification form that requested certain "spousal" data including, the name of the participant's spouse at the time benefits commenced, whether they were still married to that person as of February 25, 2013 (the date the plans were terminated), and if not, whether that spouse was deceased. (See Pls.' Resp. to Def.'s XSMF ¶ 11; see Pls.' Ex. C, Doc. 88-3 at 6.) NCR explained in its letters to John Giering and *1249 Allan Quick that the purpose of the Payee Information Verification Form was for NCR to "confirm that you [i.e. John Giering/Allan Quick] are eligible for the Additional Lump Sum Payment." (Ex. C, Doc. 88-3 at 5; Ex. D, Doc. 88-4 at 3.)
On May 8, 2013, John Giering challenged NCR's lump sum payout and lodged a claim for benefits with the NCR Plan Administrator, contesting the Plan Administrator's requirement that the Plan participant must still be "married to the same spouse as you were at the time of your benefit commencement date" to be eligible to receive the additional lump sum payment:
• The second claim I am making deals with the Additional Lump Sum Payment. The document states that you must still be married to the same spouse as you were at the time of your benefit commencement date. This requirement is erroneous. The support for my claim is set forth in Attachment 2.
(Doc. 23-2 at 2, 8.) Giering's administrative claim contends:
CLAIM AGAINST "STILL MARRIED" PROVISION
...
[REDACTED/] - Article I, Page 2, of the Plan defines an Eligible Spouse as
the spouse of a Participant who was legally married to the Participant at, and during the one-year period ending on, the Termination Date or the date of the Participant's termination of participation in the Plan.
[REDACTED/] - Article IX, Page 8, defines the Eligible Spouse's benefits in the event of a Change in Control of NCR..
[REDACTED/] - There is nothing specifically in the Plan that takes away said benefits in the case of a divorce or separation.
[REDACTED/] - Article XII, Page 11 covers Amendment and Termination of the Plan.
The Committee shall have the right, without the consent of any Participant, former Participant, Eligible Spouse or any other person claiming under or through a Participant or former Participant, to amend or modify the Plan or any agreement between NCR and any Participant thereunder from time to time or to terminate or repeal the Plan or any such agreement entirely at any time; provided, however, that no such action shall adversely affect any Participant's, former Participant's or Eligible Spouse's accrued benefits prior to such action under the Plan or the benefits payable under ARTICLE XIII.
[REDACTED/] - In determining the discounted future pension payments in the Company's 2012 Financial Statements, the company would, or should, have included Eligible Spouse's benefits as part of the Actuarial calculations.
[REDACTED/] - An Eligible Spouse's benefits as defined in the Plan cannot be changed as stated in Article XII. There is nothing in the Plan that indicates that a divorce or separation eliminates an Eligible Spouse's benefits as covered in the Plan. NCR's unilateral decision to eliminate an Eligible Spouse's accrued benefit is in violation of this Article XII. Therefore, the documents provided to Participants in the Plan must be revised to properly reflect this.
*1250 (Id. at 8.) John Giering included an NCR Payee Verification Form with his claim identifying "Patricia A. Giering" as his spouse on September 1, 1998 (the benefit commencement date). (Pls.' Ex. I, Doc. 105-3.) The Payee Verification Form is signed only by John Giering. (Id. )
On July 18, 2013, the Plan Administrator notified Mr. Giering it had denied his claim for an additional lump sum based on the spousal death benefit:
Spousal Benefit Claim
After carefully considering the points raised in your correspondence, the Plan Administrator has determined that you are not entitled to the additional lump sum based on the death benefit for spousal beneficiaries. The Plan Administrator has determined that upon your death your former spouse would not be entitled to a death benefit under the Plan. Under its authority to interpret the Plan, the Plan Administrator has determined that a death benefit is payable only to an Eligible Spouse as defined in the Plan, and has further determined that an Eligible Spouse is the individual currently married to the participant on the date of the participant's
death, provided that this same individual was also married to the participant on the date benefits commenced. Since your former spouse is not entitled to a death benefit under the Plan, the Plan Administrator has determined that you are not entitled to the additional lump sum.
(Doc. 23-2 at 11, 13.)
John Giering submitted an administrative appeal on September 14, 2013 in which he contended both that the Plan Administrator's denial of the additional lump sum to his previous spouse was incorrect and that the Plan Administrator's decision that he was not eligible for the additional lump sum payment violated the terms of the plan:
C. THE PLAN ADMINISTRATOR'S DENIAL OF THE ADDITIONAL LUMP SUM TO MY PREVIOUS SPOUSE IS INCORRECT.
...
The Plan Administrator's decision that I am not eligible for the Additional Lump Sum Payment under the Eligible Spouse provision violates the terms of the Plan, is made in bad faith and is an abuse of discretion.
(Id. at 24, 27.) John Giering's administrative appeal of the denial of the additional lump sum payment further asserts:
*1251 d. I Retire and Begin to Receive Plan Benefits
I retired from NCR effective September 1, 1998, and this Is the date on which benefits commenced under the Plan. Effective September 1, 1998, I was paid $235,315.60 per year under the Plan, A 75% Joint and Survivors provision was incorporated In the Plan in order to provide for my Eligible Spouse.
a. Eligible Spouse Benefits Under the Plan
Under the terms of the Plan, the Identity of the Eligible Spouse (and her rights under the Plan) is to be determined as of September 1, 1998. As of that date, I was married to Patricia Giering.
Our marriage was dissolved on September 25, 2002. There is no provision in the Plan itself which provides that an Eligible Spouse's rights can be extinguished by divorce or separation after the rights have vested.
Patricia and I reasonably relied on the commonsense definition of Eligible Spouse and we factored in the benefits to be paid under the Plan when dividing the marital assets. The Separation Agreement between us provided in relevant part:
Top Hat Pension Account; This account Is a non-qualified and unfunded account which shall be divided equally between the parties. As a non-qualified plan, the rules and regulations of the Employee Retirement income Security Act of 1984 do not apply, and it Is not subject to a qualified domestic relations order. The parties agree that, during Husband's lifetime, Wife's interest in this account shall be distributed to
Wife as spousal support as set forth in Section L hereinafter. The parties further acknowledge that the Top Hat Pension Account is a marital asset and that each party is entitled to fifty percent (50%) of the proceeds therefrom. In the event Husband predeceases Wife, Wife shall then receive 75% of the total benefit (as provided by the plan) and she shall thereafter be solely responsible for any end all tax consequences associated therewith.
...
2. ANALYSIS OF ELIGIBLE SPOUSE BENEFIT
Under the clear terms of the Senior Executive Plan, both as originally drafted and as amended earlier this year, Patricia Giering is the Eligible Spouse. She was married to me on the date I commenced benefit payments under the Plan and her rights vested as of that date.
...
This clear mandate under the Plan that, once vested, an Eligible Spouse's rights cannot be eliminated was acknowledged by Julie Gallagher, Esq., NCR's Director of Executive Compensation and Compliance. In an e-mail dated September 22, 2003, responding to an Inquiry from Tom Mays, another Plan participant, as to whether a divorce would extinguish his former wife's eligibility for benefits under the Plan, Ms. Gallagher stated that
We consider the spousal benefit to be inalienable, regardless of what is In the divorce decree. It became her vested benefit at the time your retirement commenced.
...
Another reason to reverse the Plan Administrator's decision is that I reasonably relied on the clear Plan language to my detriment. As the former CFO of NCR Corporation and as a person knowledgeable in interpreting contracts, I carefully reviewed the terms of the Plan during the negotiation of the divorce decree. Patricia and I reasonably relied upon our belief, based on the clear language of the Plan, that Patricia Giering had a vested right as an Eligible Spouse to the benefits, Including any benefits payable to Patricia Giering on my death. See, John Glaring Affidavit attached as Exhibit I. This interpretation, which was used to decide the division of assets, was entirely consistent with the Plan language and with prior NCR's interpretation of the Plan as demonstrated by Ms. Gallagher's email to Mr. Mays. The interpretation was fair and reasonable.
*1252 (Id. at 25-27, 30.)
On January 14, 2014, the Plan Administrator for NCR denied John Giering's administrative appeal, stating:
You also appeal the Plan Administrator's determination that neither you nor your former spouse is entitled to the Additional Lump Sum based on a spousal death benefit. Having carefully considered the points in your appeal, the Plan Administrator has determined that your appeal twist be denied. As of February 25, 2013, you were no longer married to the individual to whom you were married on the date your SERP benefit commenced. The Plan states that only an Eligible Spouse is emitted to a death benefit, and defines Eligible Spouse as the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence. The Plan Administrator interprets this language to mean that the Eligible Spouse is the spouse (if any) who is married to the participant both on the date that benefits commence, and on the date of the participant's death, or, if earlier. February 25, 2013. The Plan Administrator has determined that this interpretation is comet, because the starting point of the definition of Eligible Spouse is the Participant's spouse, which the Plan Administrator has determined is best read as denoting current spousal status as of the participant's death (or February 25, 2013, if earlier), the date on which any spousal tights to a death benefit ripen. The
Plan Administrator has further determined that the cases cited in your letter apply to fended plans qualified under Code section 401 and ERISA section 205, and do not apply to an unfunded. nonqualified plans not covered by Code section 401 or ERISA section 205, inch as the Plan. The Plan Administrator has further determined that any agreement individually negotiated in the past between any participant and the Company apply only to the participant coveted by such individually negotiated written agreement and is not applicable or relevant to any other participant to addition, the Plan Administrator has determined that, under the Plan, it may not add to, subtract from or modify any of the terms of the Plan, or change or add to any benefits provided by the Plan, or waive or fail to apply any requirements of eligibility to receive a benefit wider the Plan, end has further determined that under the Plan's terms it is therefore not permitted to provide a spousal death benefit on the basis of participants' reliance when such reliance is not based on a Plan provision.
(Id. at 40-41.) The denial letter concludes by advising Giering that he has exhausted the Plan's procedures and that any claim or action by or on behalf of a participant or beneficiary must be brought in this Court. (Id. )
Allan Quick filed a claim for benefits with the NCR Plan Administrator on May 15, 2013. (Pls.' Resp. to Def.'s XSMF ¶ 21; Def.'s Ex. 15, Doc. 93-19.) He included an NCR Payee Verification Form with his claim identifying "Nancy Quick" (Plaintiff Nancy Parin) as his spouse on February 1, 1998 (the benefit commencement date). (Pls.' Ex. J, Doc. 105-4.) Among other things, Quick challenged NCR's termination of the plan and payment of a lump sum using an unreasonable actuarial discount rate as adversely impacting his ability to comply with his obligation to pay court-ordered lifetime annual alimony payments to his ex-wife (Theresa Quick) based on his expected payout under his retirement plans for the remainder of his lifetime:
CLAIM AGAINST ADVERSE IMPACT OF AMENDMENT AND TERMINATION OF THE PLAN
[REDACTED/] - The Participant was appointed as an officer and designated to participate in the SERP June 1, 1987. At that time, the Participant was married to Theresa Quick as shown on the Plan documents dated June 4, 1987 (Attached).
[REDACTED/] - That 29-year marriage terminated after the Change of Control occurred but before the commencement of the Participant's benefits under tho Plan.
[REDACTED/] - The Participant was aware of the retirement benefits available to him should he retire three years after the Change of Control and did discuss this with the Executive Compensation personnel in the Law Department at the time of the divorce in order to determine an equitable distribution of his accrued benefits under the Plan for the divorce settlement.
[REDACTED/] - The Participant and spouse agreed to a divorce settlement that Included payment of a portion of the Participants retirement income, $2500 per month or $30,000 per year, for the lifetime of the Participant's spouse.
*1253 (Doc. 12-5 at 8.) Allan Quick indicated in his claim that he agreed to the court-ordered divorce settlement payment under the belief that the SERP benefit would continue throughout his lifetime based on the establishment of Benefit Protection Trusts based on documents he received from the NCR Law Department stating:
NCR has established two trusts for the purpose of securing benefits for which you may be eligible under your severance agreement with NCR and the supplemental retirement plans for NCR Officers.
NCR has transferred, to each of these trusts, funds for the purpose of securing these benefits....
(Id. at 9.) Quick contended that NCR's decision to issue a lump sum payment would result in an adverse impact to his benefits because:
[REDACTED/] - The planned lump sum payout with discount, actuarial reduction and immediate (2013) maximum tax implications will make it impossible for the Participant to continue to meet his commitment to the continuing annual payment obligation without a significant negative impact to what would have normally been the Participant's portion of the benefit payment.
[REDACTED/] - The Participant's ex-spouse is still living, has not remarried and is dependent on that income.
[REDACTED/] - Article XII, Page 11 covers Amendment and Termination of the Plan.
The Committee shall have the right, without the consent of any Participant, former Participant, Eligible Spouse or any other person claiming under or through a Participant or former Participant, to amend or modify the Plan or any agreement between NCR and any Participant thereunder from time to time or to terminate or repeal the Plan or any such agreement entirely at any time; provided, however, that no such action shall adversely affect any Participant's, former Participant's or Eligible Spouse's accrued benefits prior to such action under the Plan or the benefits payable under ARTICLE XIII.
(Id. ) Quick asked NCR to increase his lump sum payout, or alternatively, to reallocate "the additional lump sum" of $244,844.82 to Theresa Quick (his first ex-wife) in order to off-set the amount he would be unable to pay in alimony as a resolution of his claim:
*1254 [REDACTED/] - The Participant was married to Theresa Quick for the majority of his NCR career and based the alimony portion of the divorce settlement with her on the justifiable belief that the biweekly SERP payments would continue throughout his lifetime. The lump sum payout will make continuing the court-ordered payments to his ox spouse very difficult. This constitutes a significant adverse financial impact to the Participant and jeopardizes his ability to continue to comply with the court ordered alimony payments he has made since the divorce in 1992 Therefore, it is proposed that the Additional Lump Sum payment of $244,844.22, allocated on the NCR Pension Flan Statement for the Eligible Spouse, be made to Theresa Quick, the original spouse named in the SERP documents. This can be viewed as payout for the alimony that has been placed in jeopardy by the termination of the SERP. The Participant can then negotiate a modification of the court ordered alimony.
(Id. ) Quick mentioned that he had "remarried for a brief period (less than a year) in 1995 which included the date the Plan benefits began" and that "all obligations, financial and otherwise relative to that marriage were resolved at the time of the divorce (November 1995)." (Id. )
The Plan Administrator construed Allan Quick as having "ma[d]e a claim for an Additional Lump Sum benefit payable to [his] former spouse, Theresa Quick." (Id. at 14.) NCR denied each of Quick's claims for benefits, including his claim related to the Additional Lump Sum payment. As a basis for its decision, the Plan Administrator relied on the provisions of the Plan, giving the Administrator "sole discretionary authority to interpret and make benefit determinations under the Plan." (Id. ) The Plan administrator determined that "a lump sum payment does not 'adversely affect' the 'accrued benefit' ... if the lump sum is the actuarial equivalent of the accrued benefit under the Plan, calculated using a discount rate" that is reasonable. (Id. at 15.) In denying the "Spousal Benefit Claim," the Plan Administrator explained:
Spousal Benefit Claim
After carefully considering the points raised in your correspondence, the Plan Administrator has determined that neither you nor Ms. Quick are entitled to au Additional Lump Sum based on the death benefit for spousal beneficiaries. The Plan Administrator has determined that upon your death your former spouse would not be entitled to a death benefit under the Plan. Under its authority to interpret the Plan, the Plan Administrator has determined that a death benefit is payable only to an Eligible Spouse as defined in the Plan, and has further determined that an Eligible Spouse is the individual currently married to the participant on the date of the participant's death, provided that this same individual was also married to the participant on the date benefits commenced. Since your former spouse is not entitled to a death benefit under the Plan, the Plan Administrator has determined that you are not entitled to the additional lump sum.
(Id. at 16.)
On October 10, 2013, Allan Quick wrote a letter appealing the Plan Administrator's denial of his claims, stating:
In its claim denial letter, the Administrator justified the rejection of the claim based on "death benefit for spousal beneficiaries" and the Plan's rules for an "Eligible Spouse" when in fact the claim was based on the fact that the Participant entered into a divorce settlement, including a court-assigned lifetime alimony which was based on his SERP benefit, with the full and documented belief that the SERP benefit would exist through his lifetime to satisfy that obligation; assuming NCR's solvency ... The Participant's assertion in the claim is that he was harmed by the SERP termination. The "Additional Lump Payment," intended for the "Eligible *1255 Spouse," was mention[ed] only as one possible means of satisfying the damages incurred by the Participant as a result of the SERP termination and the existing court-order obligation. Therefore, the Administrator did not address the basic claim when he determin[ed] that Theresa Quick was not an "Eligible Spouse" and neither she nor the Participant are entitle[d] to the Additional Lump Sum payment. The basis of the claim is that the Participant's accrued benefit was adversely affected by the Lump Sum Payment with its 5% discount rate and single-year maximum income tax.
(Id. at 28-29.)
On February 5, 2014, the Plan Administrator denied Allan Quick's appeal, in language identical to that in the Giering appeal denial:
You also appeal the Plan Administrator's determination that neither you nor your former spouse is entitled to the Additional Lump Sum based on a spousal death benefit. Having carefully considered the points in your appeal, the Plan Administrator has determined that your appeal must be denied. As of February 25, 2013. you were no longer married to the individual to whom you were married on the date your SERP benefit commenced. The Plan states that only an Eligible Spouse is entitled to a death benefit, and defines Eligible Spouse as the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence. The Plan Administrator interprets this language to mean that the Eligible Spouse is the spouse (if any) who is married to the participant both on the date that benefits commence. and on the date of the participant's death, or, if earlier. February 25, 2013. The Plan Administrator has determined that this interpretation is correct, because the starting point of the definition of Eligible Spouse is the Participant's spouse, which the Plan Administrator has determined is best read as denoting current spousal status as of the participant's death (or February 25, 2013, if earlier), the date on which any spousal rights to a death benefit ripen. The Plan Administrator has further determined that the cases cited in your letter apply to funded plans qualified under Code section 401 and ERISA section 205, and do not apply to an unfunded. nonqualified plans not covered by Code section 401 or ERISA section 205, such as the Plan. In addition, the Plan Administrator has determined that, under the Plan, it may not add to, subtract from or modify any of the terms of the Plan, or change or add to any benefits provided by the Plan, or waive or fail to apply any requirements of eligibility to receive a benefit under the Plan. and has further determined that under the Plan's terms it is therefore not permitted to provide a spousal death benefit on the basis of participants' reliance when such reliance is not based on a Plan provision.
(Id. at 37-38.) The denial letter concludes by advising Quick that he has exhausted the Plan's procedures and that any claim or action by or on behalf of a participant or beneficiary must be brought in this Court. (Id. at 38.)
On February 24, 2014, Allan Quick responded to the Plan Administrator's appeal denial letter, objecting to the Plan Administrator's failure to properly construe and consider his claim:
I received your letter of February 5, 2014 in which you conveyed the denial of my SERP claims. Once again the Plan Administrator did not address the basis of one of my claims. Below is a reprint of the section of my claim appeal that was either misread or ignored. Let me state again that I am not basing my claim on the Eligible Spouse death benefit provision. My claim is based on the expectation, based on letters from NCR law department, that my SERP benefit had been secured by a Trust and that I was safe in assuming my benefit would continue throughout my lifetime, barring NCR's insolvency, when I committed to a lifetime alimony amount based on my SERP benefit expectation. Below is a restatement the claim in question from my appeal letter dated October 10, 2013:
...
*1256 Please note that this has nothing to do with whether or not Theresa Quick was an Eligible Spouse or not! It is purely a matter of was the Participant's benefit harmed by the lump sum payout because of the court-ordered lifetime-alimony commitment he made based on the SERP expectation. I understand that my appeal options have been exhausted. However, the Plan Administrator has not addressed my claim in either the initial claim or the claim-denial appeal. My question to you is was the claim/appeal misunderstood or was the claim/appeal ignored and will it be addressed?
(Id. at 39, 40.) On March 26, 2014, the Plan Administrator responded to Allan Quick's letter, characterizing it as a "Supplemental Appeal," and once again denied the appeal. (Id. at 41.) The Plan Administrator construed the term "accrued benefit" under the Plan "as the annual benefit payable under the Plan" or "the lump sum that is the actuarial equivalent of such annual benefit," and determined that the participant's monthly alimony obligation is no different from other kinds of monthly payment obligations and "does not affect whether or not the lump sum constitutes payment of the accrued benefit." (Id. ) Finally, the Plan Administrator explained that Allan Quick could not rely on correspondence from NCR stating that the Company had established a trust for the payment of benefits as creating a reasonable expectation that the Plan benefit would be paid as biweekly payments for the life of the participant. (Id. )
NCR paid additional lump sums to two divorced/former spouses based on prior representations from NCR's corporate counsel that a divorce would not affect the spousal benefit. (See Def.'s Resp. to Pls.' SMF ¶ 24; Pls.' Resp. to Def.'s SMF ¶¶ 13, 14; Exs. 4 & 5 to the Declaration of Gregory F. Jacob.) According to the May 7, 2013 minutes of the Plan Administrator:
Mr. Clark[9] and Mr. Mays[10] are both SERP I participants. Both were divorced from their spouse after payment of SERP I benefits commenced and before February 25, 2013. Accordingly, they have been informed via the benefit statements that they are not entitled to an additional lump sum payment for spousal death benefits. Mr. Clark claimed that he was entitled to an additional lump sum ... for his ex-spouse. Mr. Mays claimed that his ex-spouse was entitled to an additional lump sum ... Both Mr. Clark and Mr. Mays provided correspondence with Julie Gallagher, an attorney with [NCR]. The correspondence informs both Mr. Clark and Mr. Mays that their ex-spouses are still *1257 entitled to a benefit even in the event of a divorce.
(Ex. 5 to Jacob Decl. at 4.) The Plan Administrator "determined that any SERP participants who divorced after their benefit commencement date and before February 25, 2013, would not receive an additional lump sum based on the spousal death benefit" based on its interpretation of SERP "as providing for a spousal death benefit only if the participant is married as of his date of death to the same spouse he was married to on his benefit commencement date." (Id. at 5.) In addressing the merits of the claims of Mr. Clark and Mr. Mays, the meeting minutes also indicate that the Plan Administrator decided: (i) "that the ex-spouse benefit, if any, should be provided only to the ex-spouse. In no event should the benefit be payable to the participant;" (ii) the "prior interpretation of the plan is correct and the plan does not provide for this benefit;" (iii) "even though Ms. Gallagher was not the Plan Administrator and did not follow proper claims procedures, Mr. Clark and Mr. Mays might have reason to believe that she spoke for the Company with respect to their benefits," (iv) "based on Ms. Gallagher's correspondence, the participants may have entered a side-deal and/or may have detrimentally changed their positions in [ ] reliance on this side-deal," and (v) as a result "there was a litigation risk that the Company would be required to pay the additional lump sum to the claimants' ex-spouses." (Id. ) For these reasons, the Plan Administrator decided to "grant the claims, notwithstanding the plan's terms, and to pay the additional lump sum benefit to the respective ex-spouses of Mr. Clark and Mr. Mays." (Id. ; Pls.' Resp. to Def.'s SMF ¶¶ 14 13; Ex. 5 to Jacob Decl. at 4.)
V. CROSS-MOTIONS FOR SUMMARY JUDGMENT
Plaintiffs Patricia Giering and Nancy Parin assert that the plain and unambiguous language of the NCR Senior Executive Retirement, Death and Disability Plan ("SERP") entitles each of them, as "eligible spouses," to a lump sum spousal benefit payment as a result of NCR's early termination of the plan. Defendant, in opposition to Plaintiff's motion for summary judgment, offers no substantive response to Plaintiffs' arguments regarding the proper interpretation of the term "eligible spouse." Instead, Defendant limited its response and cross-motion for summary judgment to the sole question of whether Patricia Giering and Nancy Parin exhausted their administrative remedies. Defendant asserts that because neither Patricia Giering nor Nancy Parin filed administrative claims for benefits with the NCR Plan Administrator, their claims should be dismissed, (subject to a right to re-file in federal court, if they fail to obtain relief through the administrative process). The Court will therefore first address the administrative exhaustion issue.
A. Defendant's Cross-Motion for Summary Judgment: Whether Plaintiffs Patricia Giering and Nancy Parin Are Subject to SERP's Administrative Claims Procedure or Whether They Are Excused From Filing Administrative Claims With the Plan Administrator
In the Eleventh Circuit "plaintiffs in ERISA cases must normally exhaust available administrative remedies under their ERISA-governed plans before they may bring suit in federal court." Springer v. Wal-Mart Assoc. Grp. Health Plan , 908 F.2d 897, 899 (11th Cir. 1990). District courts may excuse the exhaustion requirement "where resort to an administrative scheme is unavailable or would be "futile," or where the remedy would be 'inadequate.' "
*1258 Perrino v. S. Bell Tel. & Tel. Co. , 209 F.3d 1309, 1318 (11th Cir. 2000) (citing Counts v. Am. Gen. Life & Acc. Ins. Co. , 111 F.3d 105, 108 (11th Cir. 1997) and Curry v. Contract Fabricators, Inc. Profit Sharing Plan , 891 F.2d 842, 846-47 (11th Cir. 1990) ). These exceptions are narrowly construed and should only be used when "requiring a plaintiff to exhaust an administrative scheme would be an empty exercise in legal formalism." Id. District courts have sound discretion in deciding whether an exception applies and the decision shall be upheld absent abuse of discretion. Springer , 908 F.2d at 899.
The Court has already considered and rejected Defendant's exhaustion argument because the NCR Plan Administrator has determined that Plaintiffs Patricia Giering and Nancy Parin are not entitled to spousal death benefits under its interpretation of the "Eligible Spouse" provision. Defendant argues that the Court's determination that further administrative exhaustion of the "Eligible Spouse" benefit would be futile was based solely on the pleadings and a limited set of documents. Now on summary judgment, however, Defendant relies on evidence in the administrative record that "of the four total former spouses with potential 'Eligible Spouse' claims, two of them (that is, the two other than Giering and Parin) had their claims adjudicated by the NCR Plan Administrator, and both were awarded lump sums." (Def.'s Resp. and Cross-Mot. at 2-3.) Defendant contends that "Giering and Parin cannot possibly show they would have no hope of prevailing," and therefore, the evidence irrefutably shows that it would not be futile for Giering and Parin to pursue administrative claims with the Plan Administrator. (Id. at 3.)
With respect to Patricia Giering, Defendant repeats the exhaustion arguments previously rejected by the Court in the Order denying the motion to dismiss Giering's claim for spousal benefits. Defendant once again asserts that Patricia Giering has not exhausted her administrative remedies because: (i) she never submitted an administrative claim with the NCR Plan Administrator; (ii) John Giering's administrative claim sought the benefit for himself rather than for Patricia; and (iii) there is no evidence Patricia authorized John Giering to file a claim on her behalf.
Additionally, Defendant asserts that Nancy Parin cannot be deemed to have exhausted her administrative remedies with respect to her "eligible spouse" claim because: (1) Allan Quick's administrative claim makes no mention of Nancy Parin, but instead sought the benefit for his first wife, Theresa Quick; (2) Allan Quick's claim with respect to Theresa Quick was in an entirely different posture because he divorced Theresa Quick before his benefit under SERP commenced; (3) Allan Quick expressly stated in his administrative appeal that he was not raising an "Eligible Spouse" claim; and (4) Allan Quick was not seeking a benefit payment on behalf of Theresa Quick, but rather was seeking an increased benefit payment to himself. For these reasons, Defendant argues that the Plan Administrator "has never had a chance to consider Nancy Parin's claims." (Id. at 5.)
Plaintiffs assert, in response, that Defendant's cross-motion should be denied because this Court has already determined that Patricia Giering is not required to further exhaust her claim for spousal benefits in light of the Plan Administrator's interpretation of "Eligible Spouse," and that determination applies equally to Nancy Parin. Thus, Plaintiffs argue that any further administrative review of Giering's or Parin's spousal benefit claims would be entirely futile because of NCR's adopted interpretation of "Eligible Spouse" as precluding benefits for the divorced. Additionally, Plaintiffs argue that because NCR's *1259 Plan Administrator failed to meet ERISA's minimum claims procedure requirements, Plaintiffs' administrative remedies are deemed exhausted as a matter of law. Specifically, Plaintiffs contend that: (a) NCR failed to provide Giering and Parin adequate notice of adverse benefit determinations; (b) NCR failed to follow reasonable procedures for determining who is authorized to act on behalf of a claimant; (c) NCR failed to provide Plaintiffs with the reason (it now claims) the Plan Administrator denied the Giering and Quick claims for spousal benefits; (d) NCR failed to establish and follow "administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents;" and (e) NCR failed to apply its plan provisions consistently.
In the prior Order addressing the precise arguments Defendant repeats again on summary judgment, the Court acknowledged that the analysis of the administrative exhaustion question is complicated by the Plaintiffs' allegations that Patricia and Nancy's administrative claims were brought and exhausted by their former husbands. The genesis of this complication appears to be one created by the Plan Administrator, not by the Plaintiffs or their ex-husbands. When it terminated its retirement plans and administered benefits to Plan participants in lump sum payments, NCR advised John Giering and Allan Quick that they themselves may be entitled to the accrued spousal death benefit payable as an additional lump sum payment under the Plan Administrator's eligibility criteria.
As laid out in detail above, NCR sent its Plan participants written notification of the termination of the Plan notifying them that their unpaid accrued benefits would be made in a lump sum payment. The letters included Nonqualified Pension Plan Statements for each SERP participant detailing the amount of the lump sum benefit, including an additional lump sum as the unpaid accrued death benefit of the surviving eligible spouse under Article IX of SERP. The letters, addressed to John Giering and Allan Quick as the SERP Plan participants, expressly stated:
You may also be entitled to the additional lump sum payment as shown on page 2 of the Nonqualified Pension Plan Statement in connection with your joint & survivor annuity form of payment.[11] In order to confirm that you are eligible for the additional lump sum payment, we must confirm the information requested on the Payee Information Verification Form.
(Pls.' Ex. C) (emphasis added). The Plan Statements further provided:
If you meet certain criteria, you are eligible to receive an additional lump sum payment. You must meet the eligibility criteria as follows:
• You were married at the time of your benefit commencement date
• You are receiving a joint & survivor annuity form of payment
• You are still married to the same spouse as you were at the time of your benefit commencement date
If you meet all the criteria listed above and we confirm your eligibility, you will receive an Additional Lump Sum Payment ... In order for us to confirm that you are eligible for the Additional Lump Sum Payment, you must do the following:
*1260 • Complete the Payee Information Verification Form
• Have your signature and (if applicable) your spouse's signature[12] notarized by a Notary Public
• Mail the completed form ... to: NCR SERP Service Center ...
(Id. ) (emphasis added). These letters and notices were not sent to the ex-spouses at issue who were derivative plan participants. Thus, it is not surprising that the Plan participant's claim for benefits might be read as asserting a claim for benefits on his own behalf, rather than on behalf of his eligible spouse.
None of NCR's correspondence with its Plan participants during the administrative claims process ever informed the participant that he could not assert a claim for the spousal death benefit on his own behalf (or on behalf of his spouse/ex-spouse). Rather, in its claim denials, the Plan Administrator stated:
The Plan Administrator has determined that upon your death your former spouse would not be entitled to a death benefit under the Plan ... Since your former spouse is not entitled to a death benefit under the Plan, the Plan Administrator has determined that you are not entitled to the additional lump sum.
(Doc. 23-2 at 13; see also Doc. 12-5 at 16.) Additionally, for the 63 Plan participants who met NCR's eligibility criteria under its interpretation of the "Eligible Spouse" provision (i.e. were still married on the date of the Plan termination to their spouse at the time of their retirement), NCR paid out the spousal death benefit as an Additional Lump Sum directly to the SERP Plan participant (not to the eligible spouse). (See Ex. 6 to Jacob Decl., Doc. 94-3 "Final Payments to NCR SERP Participants.")
1. Patricia Giering's Claim
With respect to Patricia Geiring's claim, the Court finds support in John Giering's administrative challenges that: (a) through his claim, John asserted Patricia's rights to her vested interest in the spousal death benefits in the form of a lump sum payment upon termination of the plan, (b) the Plan Administrator interpreted John Giering to make such a claim, and (c) the Plan Administrator expressly made a determination that Patricia Giering, John's former spouse, was not entitled to the benefits because she was not an "Eligible Spouse" under its interpretation of the plan language.
For example, in his May 8, 2013 administrative claim, John Giering challenged NCR's lump sum payout and contested the Plan Administrator's requirement that the Plan participant must still be "married to the same spouse as you were at the time of your benefit commencement date" to be eligible to receive the additional lump sum payment:
[REDACTED/] - An Eligible Spouse's benefits as defined in the Plan cannot be changed as stated in Article XII. There is nothing in the Plan that indicates that a divorce or separation eliminates an Eligible Spouse's benefits as covered in the Plan. NCR's unilateral decision to eliminate an Eligible Spouse's accrued benefit is in violation of this Article XII. Therefore, the documents provided to Participants in the Plan must be revised to properly reflect this.
(Doc. 23-2 at 2, 8.) John Giering identified Patricia Giering in the NCR Payee Verification *1261 Form submitted with his claim. (Id. at 3.) In its July 18, 2013 claims denial, the Plan Administrator notified Geiring that neither he nor his former spouse, Patricia Giering, were entitled to the death benefit for spousal beneficiaries because they were not currently married:
Spousal Benefit Claim
After carefully considering the points raised In your correspondence, the Plan Administrator has determined that you are not entitled to the additional lump sum based on the death benefit for spousal beneficiaries. The Plan Administrator has determined that upon your death your former spouse would not be entitled to a death benefit under the Plan. Under its authority to interpret the Plan, the Plan Administrator has determined that a death benefit Is payable only to an Eligible Spouse as defined in the Plan, and has further determined that an Eligible Spouse Is the individual currently married to the participant on the date of' the participant's death, provided that this same individual was also married to the participant on the date benefits commenced. Since your flamer spouse is not entitled to a death benefit under the Plan, the Plan Administrator has determined that you are not entitled to the additional lump sum.
(Id. at 11, 13.)
In his September 14, 2013 administrative appeal, John Giering contended both that the Plan Administrator's denial of the additional lump sum to his previous spouse was incorrect and that the Plan Administrator's decision that he was not eligible for the additional lump sum payment violated the terms of the plan:
C. THE PLAN ADMINISTRATOR'S DENIAL OF THE ADDITIONAL LUMP SUM TO MY PREVIOUS SPOUSE IS INCORRECT.
...
The Plan Administrator's decision that I am not eligible for the Additional Lump Sum Payment under the Eligible Spouse provision violates the terms of the Plan, is made In bad faith and is an abuse of discretion.
(Id. at 24, 27.) Giering's September 14, 2013 administrative appeal asserts that under the terms of the plan, Patricia's eligibility for benefits was determined as of the date of his retirement and that NCR's determination that their divorce extinguished those rights was contrary to the plan language:
*1262 C. THE PLAN ADMINISTRATOR'S DENIAL OF THE ADDITIONAL LUMP SUM TO MY PREVIOUS SPOUSE IS INCORRECT.
...
b. Eligible Spouse Provisions
Article IX, paragraph 2, of the Plan as amended September 23, 1991 provides a benefit for the Eligible Spouse.
Article I defines `Eligible Spouse' as:
the spouse of a Participant who was legally married to the Participant at, and during tie one year period ending on, the Termination Date or the date of the Participant's termination of participation in the Plan.
Article I defines `Termination Date' as:
the date on which a Participant ceases to be employed by NCR or any of Its foreign or domestic subsidiaries, by reason of such Participant's death, Total Disability, retirement, resignation, discharge or otherwise.
c. Plan Administrator's Discretion Under The Plan
While the Plan Administrator does have discretion to interpret and to modify the Plan, the Plan itself prohibits the Plan Administrator from taking any action which shall adversely affect any Participant's, former Participants or Eligible Spouse's accrued benefits.... Article XII.
d. I Retire and Begin to Receive Plan Benefits
I retired from NCR effective September 1, 1998, and this is the date on which benefits commenced under the Plan. Effective September 1, 1998, I was paid $235,315.60 per year under the Plan. A 75% Joint and Survivors provision was incorporated In the Plan in order to provide for my Eligible Spouse.
e. Eligible Spouse Benefits Under the Plan
Under the terms of the Plan, the identity of the Eligible Spouse (and her rights under the Plan) is to be determined as of September 1, 1998. As of that date, I was married to Patricia Giering.
Our marriage was dissolved on September 25, 2002. There is no provision in the Plan itself which provides that an Eligible Spouse's rights can be extinguished by divorce or separation after the rights have vested.
...
Under the clear terms of the Senior Executive Plan, both as originally drafted and as amended earlier this year, Patricia Glaring is the `Eligible Spouse.' She was married to me on the date I commenced benefit payments under the Plan and her rights vested as of that date.
(Id. at 24-25.)[13] John explained that when they divorced, he and Patricia relied on the Plan language (as supported by NCR's own prior interpretation of that language), regarding Patricia's right to the spousal death benefit:
*1263 Patricia and I reasonably relied on the commonsense definition of Eligible Spouse and we factored in the benefits to be paid under the Plan when dividing the marital assets. The Separation Agreement between us provided in relevant part:
Too Hat Pension Account: This account is a non-qualified and unfunded account which shall be divided equally between the parties. As a non-qualified plan, the rules and regulations of the Employee Retirement Income Security Act of 1984 do not apply, and It is not subject to a qualified domestic relations order. The parties agree that, during Husband's lifetime. Wife's interest in this account shall be distributed to Wife as spousal support as set forth in Section L hereinafter. The parties further acknowledge that the Top Hal Pension Account is a marital asset and that each party Is entitled to fifty percent (50%) of the proceeds therefrom. In the event Husband predeceases Wife. Wife shall then receive 75% of the total benefit (as provided by the plan) and she shall thereafter be solely responsible for any end all tax consequences associated therewith.
...
This clear mandate under the Plan that, once vested, an Eligible Spouse's rights cannot be eliminated was acknowledged by Julie Gallagher, Esq., NCR's Director of Executive Compensation and Compliance. In an e-mail dated September 22, 2003, responding to an Inquiry from Tom Mays, another Plan participant, as to whether a divorce would extinguish his former wife's eligibility for benefits under the Plan, Ms. Gallagher stated that:
We consider the spousal benefit to be inalienable, regardless of what is In the divorce decree. It became her vested benefit at the time your retirement commenced.
...
Another reason to reverse the Plan Administrator's decision is that I reasonably relied on the clear Plan language to my detriment. As the former CFO of NCR Corporation and as a person knowledgeable in interpreting contracts, I carefully reviewed the terms of the Plan during the negotiation of the divorce decree. Patricia and I reasonably relied upon our belief, based on the clear language of the Plan, that Patricia Giering had a vested right as an Eligible Spouse to the benefits, including any benefits payable to Patricia Giering on my death. See, John Giering Affidavit attached as Exhibit I. This Interpretation, which was Used to decide the division of assets, was entirely consistent with the Plan language and with prior NCR's interpretation of the Plan as demonstrated by Ms. Gallagher's email to Mr. Mays. The interpretation was fair and reasonable.
(Id. at 25, 27-28, 30.)
On January 14, 2014, the Plan Administrator for NCR denied John Giering's administrative appeal, again interpreting the "Eligible Spouse" provision as inapplicable to Patricia Giering:
You also appeal the Plan Administrator's determination that neither you nor your former spouse is entitled to the Additional Lump Sum based on a spousal death benefit. Having carefully considered the points is your appeal, the Plan Administrator has determined that your appeal must be denied, As of February 25, 2013, you were no longer married to the individual to whom you were married on the date your SERP benefit commenced. The Plan states that only an Eligible Spouse is entitled to a death benefit, and defines Eligible Spouse as die spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence. The Plan Administrator Wapitis this language to mean that the Eligible Spouse is the spouse (if any) who is married to the participant both on the date that benefits commence, end on the date of the participant's death, or, if earlier, February 23, 2013. The Plan *1264 Administrator has determined that this interpretation is correct, because the starting point of the definition of Eligible Spouse is the Participant's spouse, which the Plan Administrator has determined is best read as denoting current spousal status as of the participant's death (or February 25, 2013, if earlier), the date on which any spousal rights to a death benefit ripen. The Plan Administrator has further determined that the cases cited in your letter apply to funded plans qualified under Code section 401 and ERISA section 205, and do not apply to an unfunded, nonqualified plans not covered by Code section 401 or ERISA section 205, such as the Plan. The Plan Administrator has further determined that any agreement individually negotiated in the past between any participant and the Company apply only to the participant covered by such individually negotiated written agreement and is not applicable or relevant to any other participant in addition, the Plan Administrator has determined that, under the Plan, it may not add to, subtract from or modify any of the terms of the Plan, or change or add to any benefits provided by the Plan, or waive or fail to apply any requirements of eligibility to receive a benefit under the Plan, and hat butter determined due under the Plan's terms it is therefore not permitted to provide a spousal death, benefit on the basis of participants' reliance when such reliance is not based on a Plan provision.
(Id. at 40-41.)
In addressing Giering's challenge to NCR's interpretation of the "Eligible Spouse" provision, the Plan Administrator expressly stated:
The above determination regarding your former spouse is based on information that was provided to the Plan Administrator. The Plan Administrator may reconsider this determination should yon provide any additional documentation demonstrating that your former spouse is an Eligible Spouse under the Plan.
(Id. at 40.) Finally, the denial letter advised Giering that he had "exhausted the Plan's procedures" and that any claim or action "in connection with a Plan benefit by or on behalf of a participant or beneficiary" must be filed in this Court. (Id. )
Although the Court has provided a lengthy explanation, the conclusion is relatively simple. The Plan Administrator has determined that Patricia Giering, John's former spouse, was not entitled to the benefits as an "Eligible Spouse" under its interpretation of the Plan language because she and John were divorced. Thus, Patricia Giering's claim (asserted in Count III) that she is entitled to the lump sum spousal death benefit as an "Eligible Spouse" has been exhausted. To the extent Patricia Giering was herself required to separately pursue an administrative claim as to her eligibility for benefits, the Court finds that such an endeavor would be futile under the circumstances presented here.
Defendant's argument - that there is no evidence that Patricia authorized John Giering to file a claim on her behalf - does not affect the Court's conclusion. On the flipside, there is also no evidence that John Giering was not authorized to assert Patricia's interest in the spousal benefits. More importantly; however, the Plan Administrator construed John Giering's administrative claims as asserting his ex-wife's right to the benefit as an "Eligible Spouse," yet never asked whether John Giering was authorized as Patricia's representative to assert a claim to benefits on her behalf and never asked John Giering to submit a written authorization prior to making its determination of Patricia Giering's "eligible spouse" status and denying her entitlement to the benefit. The evidence shows that NCR denied the claim *1265 and appeal based on its determination that Patricia Giering was not an "Eligible Spouse" because she was no longer married to John Giering - not because Mr. Giering failed to submit a written authorization form in support of her claim.
Patricia Gieiring is therefore excused from ERISA's exhaustion requirement with respect to the eligible spouse claim.
2. Nancy Parin's Claims
Contrary to Defendant's representation that Allan Quick's administrative claim makes no mention of Nancy Parin, he filed a claim for benefits with the NCR Plan Administrator on May 15, 2013 and included an NCR Payee Verification Form along with his claim identifying "Nancy Quick" (Plaintiff Nancy Parin) as his spouse on February 1, 1998 (the benefit commencement date). (Pls.' Resp. to Def.'s XSMF ¶ 21; Pls.' Ex. J, Doc. 105-4; Def.'s Ex. 15, Doc. 93-19.) NCR required its participants to complete the Payee Information Verification forms to provide certain "spousal" information including, the identity of the participant's spouse on the date that the benefits commenced and whether they were still married to that person as of February 25, 2013 (the date the plans were terminated). (See Pls.' Resp. to Def.'s XSMF ¶ 11; see Pls.' Ex. C, Doc. 88-3 at 6.) The purpose of the Payee Information Verification Form was for NCR to "confirm" that the participant was "eligible for the Additional Lump Sum Payment." (Ex. C, Doc. 88-3 at 5; Ex. D, Doc. 88-4 at 3.)
Allan Quick did not substantively assert an administrative claim for benefits under the "Eligible Spouse" provision on behalf of Nancy Parin. In fact, it appears he advocated against her interest in his administrative claim by requesting that the Additional Lump Sum payment instead be made to his first ex-wife, Theresa Quick. (See Doc. 12-5.) Prior to his marriage to Plaintiff Nancy Parin, Allan Quick was married for 29 years to Theresa Quick. Allan and Theresa divorced in 1992, three years prior to his retirement. According to his administrative claim, Allan and Theresa agreed to a divorce settlement that included payment of a portion of Allan's retirement income, $2,500 per month or $30,000 per year, as lifetime alimony. Allan Quick based the alimony portion of the divorce settlement on the belief that the biweekly SERP retirement benefits would continue throughout his lifetime.
Allan Quick married Nancy Parin on January 28, 1995, three days before his retirement on February 1, 1995. The Prenuptial Agreement between Allan Quick and Nancy Parin provides that "the parties have agreed to marry on January 28, 1995, which is prior to Quick's retirement date, solely so that Parin's survivor benefit rights" as Quick's spouse on the date of his retirement under the NCR Senior Executive Retirement, Death & Disability Plan (SERP) "may vest prior to Quick's retirement." (Doc. 23-1 at 17-19.) Allan Quick and Nancy Parin later divorced on November 28, 1995.
After NCR terminated the Plans in February 2013 and notified Quick of its decision to issue a lump sum payment, Quick objected that the lump sum payout constituted a significant adverse financial impact by jeopardizing his ability to comply with his court-ordered alimony payments. To offset this hardship, Quick proposed "that the Additional Lump Sum payment of $244,844.22, allocated on the NCR Pension Plan Statement for the Eligible Spouse, be made to Theresa Quick, the original spouse named in the SERP documents,"[14]
*1266 rather than to Nancy Parin to whom he was married on the date his benefits commenced as indicated on the Payee Information Verification form. (Doc. 12-5 at 9; Pls.' Ex. J.)
The Plan Administrator construed Allan Quick as having made a claim for an Additional Lump Sum benefit and "determined that neither [Mr.] nor Ms. Quick are entitled to an Additional Lump Sum based on the death benefit for spousal benefits." (Doc. 12-5 at 14, 16.) The Plan Administrator's denial of benefits was based on its interpretation of the "Eligible Spouse" provision of the plan:
Under its authority to interpret the Plan, the Plan Administrator has determined that a death benefit is payable only to an "Eligible Spouse" as defined in the Plan, and has further determined that an Eligible Spouse is the individual currently married to the participant on the date of the participant's death, provided that this same individual was also married to the participant on the date benefits commenced.
(Id. at 16.)
Allan Quick explained in his administrative appeal that: (i) the Plan Administrator did not address the actual basis of his claim; (ii) the basis of his claim was that his accrued benefit has been additionally "adversely impacted" by the SERP termination and associated lump sum payment as a result of his commitment to lifetime alimony based on a portion of his SERP benefit, and (iii) his request for "the "Additional Lump Payment," intended for the 'Eligible Spouse,' was mention[ed] only as one possible means of satisfying the damages incurred by the Participant as a result of the SERP termination and the existing court-order obligation." (Id. at 28-29.)
The Plan Administrator denied Allan Quick's appeal, again without discussion of the basis of his claim that the lump sum payment constituted an adverse impact based on his obligations to his ex-spouse. Using language identical to that of the appeal denial of John Geiring, the Plan Administrator stated:
As of February 25, 2013, you were no longer married to the individual to whom you were married on the date your SERP benefit commenced. The Plan states that only an Eligible Spouse is entitled to a death benefit, and defines "Eligible Spouse" as "the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence." The Plan Administrator interprets this language to mean that the Eligible Spouse is the spouse (if any) who is married to the participant both on the date that benefits commence, and on the date of the participant's death, or, if earlier, February 25, 2013. The Plan Administrator has determined that this interpretation is correct, because the starting point of the definition of Eligible Spouse is the Participant's "spouse," which the Plan Administrator has determined is best read as denoting current spousal status as of the participant's death (or February 25, 2013, if earlier), the date on which any spousal rights to a death benefit ripen ... In addition, the Plan Administrator has determined that, under the Plan, it may not add to, subtract from or modify any of the terms of the Plan, or change or add to any benefits provided by the Plan, or waive or fail to apply any requirements of eligibility to receive a benefit under the Plan, and has further determined that under the Plan's terms it is therefore not permitted to provide a spousal death benefit on *1267 the basis of participants' reliance when such reliance is not based on a Plan provision.
(Id. at 37-38.) Finally, the denial letter concludes by advising Quick that he has exhausted the Plan's procedures and that any claim or action by or on behalf of a participant or beneficiary must be brought in this Court. (Id. at 38.)
Following the denial of both his claim and appeal, Allan Quick wrote in a letter that the Plan Administrator had once again failed to address the basis of his claim:
Let me state again that I am not basing my claim on the 'Eligible Spouse' death benefit provision. My claim is based on the expectation, based on letters from NCR law department, that my SERP benefit had been secured by a Trust and that I was safe in assuming my benefit would continue throughout my lifetime, barring NCR's insolvency, when I committed to a lifetime alimony amount based on my SERP benefit expectation ... Please note that this has nothing to do with whether or not Theresa Quick was an Eligible Spouse or not? It is purely a matter of 'was the Participant's benefit harmed by the lump sum payout because of the court-ordered lifetime alimony commitment he made based on the SERP expectation.[15]
(Doc. 12-5 at 40.)
Regardless of whether Allan Quick did, in fact, assert a claim for spousal death benefits in the form of an Additional Lump Sum Payment on behalf of himself, Nancy Parin, or Theresa Quick, the undisputed evidence in the administrative record shows that NCR's Plan Administrator determined that neither Quick nor his former spouse (which would include by definition Nancy Parin and Theresa Quick) were entitled to such benefits because Mr. Quick was no longer married to either woman on the date of the termination of the plans on February 25, 2013. Under the Plan Administrator's interpretation, the definition of Eligible Spouse "is best read as denoting current spousal status" as of February 25, 2013, as "the date on which any spousal rights to a death benefit ripen." (Id. at 37.) Although the Plan defines "Eligible Spouse" only as "the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence," the "Plan Administrator interprets this language to mean that the Eligible Spouse is the spouse (if any) who is married to the participant both on the date that benefits commence, and on the date of the participant's death, or, if earlier, February 25, 2013." (Id. ) Thus, while Theresa Quick was "in a different posture" than Nancy Parin, the result of the Plan Administrator's interpretation is the same. In Theresa Quick's case, she would not be entitled to benefits under the plan language because she was not married to Allan Quick on the date of his retirement (the date his benefit payments under the plan commenced). In Nancy Parin's case, she would not be entitled to benefits under the Plan Administrator's interpretation of the Plan language because she was not married to Allan Quick on the date of the termination of the plans.[16]
*1268 In Count III of the Second Amended Complaint, Nancy Parin asserts that NCR improperly denied her right to spousal benefits despite the accrual of her benefits in 1995 when her then-husband Allan Quick retired from NCR and began receiving benefits under SERP. Parin challenges NCR's interpretation of the term "Eligible Spouse" as imposing the additional requirement that she be married to the Plan participant when the Plan was terminated. Based on the record and the Plan Administrator's unwavering interpretation of the Plan language, Defendant's assertion that the Plan Administrator "has never had a chance to consider Nancy Parin's claims" is claptrap.
Because the Plan Administrator interprets "Eligible Spouse" to preclude Nancy Parin's entitlement to the spousal death benefit, requiring her to submit an administrative claim to the Plan Administrator at this stage would be an exercise in futility. Nancy Parin is therefore excused from ERISA's exhaustion requirement with respect to the eligible spouse claim.
3. Defendant's Arguments Against Futility Are Not Persuasive
Defendant argues that it would not be futile to require Giering and Parin to pursue administrative claims because: (1) it is beyond dispute that the SERP claim procedures remain open to Giering and Parin; (2) the Plan Administrator has sworn that it will give full and fair consideration to their administrative claims; and (3) both former spouses who did have their "Eligible Spouse" claims adjudicated by the Plan Administrator were awarded lump sums.
Defendant implies that the futility exception applies only where a claimant has no meaningful access to a plan's administrative claim procedures. This is incorrect. The Eleventh Circuit discussed ERISA's exhaustion requirement in Perrino v. S. Bell Tel. & Tel. Co. :
[A] district court has the sound discretion "to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate," or where a claimant is denied "meaningful access" to the administrative review scheme in place ... [T]he exhaustion requirement for ERISA claims should not be excused for technical violations of ERISA regulations that do not deny plaintiffs meaningful access to an administrative remedy procedure through which they may receive an adequate remedy ... Our exceptions to this doctrine where resort to an administrative scheme is unavailable or would be "futile," or where the remedy would be "inadequate" simply recognize that there are situations where an ERISA claim cannot be redressed effectively through an administrative scheme. In these circumstances, requiring a plaintiff to exhaust an administrative scheme would be an empty exercise in legal formalism.
Perrino v. S. Bell Tel. & Tel. Co. , 209 F.3d 1309, 1315, 1317-18 (11th Cir. 2000) (internal citations omitted); see also Curry v. Contract Fabricators, Inc. Profit Sharing Plan , 891 F.2d 842, 846-47 (11th Cir. 1990) (finding that "[w]hen a plan administrator in control of the available review procedures denies a claimant meaningful access to those procedures, the district court has the discretion not to require exhaustion"); Dickerson v. Physicians Pain Specialists of Ala. P.C. , 2011 WL 4591191, at *4 (S.D. Ala. Oct. 4, 2011) (citing Barnett v. IBM , 885 F. Supp. 581, 588 (S.D.N.Y. 1995) ) (holding that "to justify excusing exhaustion, the administrative process must be *1269 "so clearly unproductive" that "no further purpose would be served by requiring further exhaustion"). Thus, while sometimes the courts have analyzed the futility exception in the context of the issue of meaningful access to administrative proceedings, as the cases make clear, futility is a broader consideration than mere access to the administrative process.
Here, the Plan Administrator for NCR has already expressly determined, "under its authority to interpret the Plan ... that an Eligible Spouse is the individual currently married to the participant on the date of the participant's death [or, if earlier, the date of the termination of the plan], provided that this same individual was also married to the participant on the date benefits commenced." (Doc. 23-2 at 13.) As the Plan Administrator has decided that divorced spouses such as Patricia Giering and Nancy Parin are not eligible for spousal benefits under its interpretation of "Eligible Spouse," requiring Plaintiffs to go back now and engage in further administrative review would be unproductive, would serve no purpose, and would not provide them with a "fair and reasonable opportunity" to pursue their claims. See Perrino , 209 F.3d at 1318 ; Dickerson , 2011 WL 4591191, at *4. More importantly, it would be an "empty exercise in legal formalism." Perrino , 209 F.3d at 1318.
Defendant even suggests that the Plan Administrator might consider approving Giering's and Parin's request for benefits, as it did for Sandra Black and Kathy Mays. However, there is no evidence in the record to support such a finding as a basis to require Plaintiffs to trudge through the administrative process.
First and most notably, despite Defendant's characterization, neither Sandra Black nor Kathy Mays submitted administrative claims for spousal benefits to the Plan Administrator. Rather, their ex-husbands, Darrell Clark and Thomas Mays submitted claims for the Additional Lump Sum payment. Clark and Mays each relied on separate correspondence from Julie Gallagher, NCR's Director of Executive Compensation, which provided an interpretation of the "Eligible Spouse" benefit that differed from the Plan Administrator's interpretation.[17] The Plan Administrator viewed the Gallagher correspondence as creating a "side deal" with the plan participants that may have induced them to rely to their detriment in their property separation agreements at the time of their divorce. Therefore, the Plan Administrator concluded that "there was a litigation risk that the Company would be required to pay the additional lump sum to the claimants' ex-spouses." (Ex. 5 to Jacob Decl.) Although the claims were submitted by Messrs. Clark and May, the Plan Administrator decided the additional lump sum payments should be paid to their ex-spouses. The Plan Administrator made the decision to pay spousal benefits to Sandra Black and Kathy Mays, not because the Plan Administrator treated them as entitled to the benefits, but because of a perceived risk that NCR would potentially be successfully sued if they did not pay. Thus, if a similar exception could be made for the claims of Patricia Giering and Nancy Parin, the Plan Administrator could have made that determination when it was presented with the administrative claims of *1270 John Giering and Allan Quick, i.e. the Plan Administrator could have settled the claims outside of the administrative process as legal claims.
Second, there is nothing in the record that Defendant or Plaintiffs point to that would suggest that John Giering or Allan Quick personally reached similar "side deals" with NCR (or received similar correspondence from an NCR representative) in direct response to inquiries by them about the spousal death benefit. If they had, the administrative record suggests they would have presented such documentation to the Plan Administrator for consideration. Like Clark and Mays, both John Giering and Allan Quick explained that they relied on their understanding of the Plan language in negotiating their divorce settlements, and Giering cited NCR's prior interpretation of the spousal benefit provision from the Mays/Gallagher email in support of his administrative claim. But in response to Giering's and Quick's administrative claims, the Plan Administrator determined:
that any agreement individually negotiated in the past between any participant and the Company apply only to the participant covered by such individually negotiated written agreement and is not applicable or relevant to any other participant [and] that, under the Plan, it may not add to, subtract from or modify any of the terms of the Plan, or change or add to any benefits provided by the Plan, or waive or fail to apply any requirements of eligibility to receive a benefit under the Plan, and has further determined that under the Plan's terms it is therefore not permitted to provide a spousal death benefit on the basis of participants' reliance when such reliance is not based on a Plan provision.
(Doc. 23-2 41; Doc. 12-5 at 37-38.) To conclude otherwise on a second review of Patricia Giering's and Nancy Parin's entitlement on the benefits, the Plan Administrator would have to adopt a 180-degree reversal of its interpretation of the Plan language.
4. Whether Plaintiffs' Claims Are Deemed Exhausted Under ERISA For Defendant's Failure to Comply With Statutory Claims Procedures
Plaintiffs also argue that even if further administrative exhaustion would not be futile, Plaintiffs' administrative remedies are deemed exhausted as a result of Defendant's failure to comply with basic claims procedures under ERISA. Section 503 of ERISA provides:
In accordance with regulations of the Secretary, every employee benefit plan shall -
(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.
29 U.S.C.A. § 1133. The Department of Labor's regulations set forth "minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants)." 29 C.F.R. § 2560.503-1(a). The claims procedure requirements apply to every nonexempt employee benefit plan, including top hat plans. Maynard v. Merrill Lynch & Co. , 2008 WL 4790670 (M.D. Fla. Oct. 28, 2008) ; Eastman Kodak Co. v. STWB, Inc. , 452 F.3d 215, 217 (2d Cir. 2006) ("Top hat plans are exempt from many provisions of *1271 ERISA ... but like qualified plans, they are subject ... to the duty to have a claims procedure."). "[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan." 29 C.F.R. § 2560.503-1(l)(1).
Plaintiffs recite multiple ways in which Defendant failed to follow the Department of Labor's claims procedures. The Court finds Plaintiffs' arguments persuasive only as to two of these requirements.
First, NCR did not provide notice to divorced spouses Patricia Giering and Nancy Parin of the termination of the plan or its interpretation of the "Eligible Spouse" provision as depriving them of the spousal death benefit. See 29 C.F.R. § 2560.503-1(g)(1) (requiring that a plan must provide "written or electronic notification of an adverse benefit determination"); § 2520.104b-1(b)(1) (stating that notice must be "reasonably calculated to ensure actual receipt of the material"). (Exs. A & B to Pls.' Resp. to Def.'s Cross-Mot.) Nor did NCR inform Patricia Giering or Nancy Parin that their ex-husbands had submitted claims for the spousal benefit (payable as an additional lump sum payment following termination of the plans) and that those claims had been denied. (Id. ) NCR did not notify Patricia Giering or Nancy Parin of their right to appeal those determinations or their right to file suit in this Court as a result of the denial of those claims. (Id. )
Second, NCR failed to apply the "Eligible Spouse" benefit provision consistently. 29 C.F.R. § 2560.503-1(b)(6) (requiring that "benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants). The Plan Administrator admits that it paid spousal benefits to the ex-spouses of two SERP participants, despite the fact that they were divorced. NCR admits it reached this decision irrespective of its interpretation of the Plan language. The Plan Administrator did not conclude that these ex-spouses were eligible for the spousal death benefit; instead, NCR created an exception because it feared being sued.
Because Defendant failed to comply with ERISA's minimum requirements, the Court finds the claims of Patricia Giering and Nancy Parin are deemed exhausted under 29 C.F.R. § 2560.503-1(l)(1).
Accordingly, for all of the foregoing reasons, the Court DENIES Defendant's Cross-Motion for Summary Judgment [Doc. 93].[18]
B. Plaintiffs' Motion for Summary Judgment on Count III: The Eligible Spouse Claim
Plaintiffs assert that the Court must grant summary judgment in their favor on Count III because there are no genuine factual disputes, where the question before the Court is purely one of contract interpretation. Plaintiffs advocate for the application of a de novo review of the Plan Administrator's decision, citing Holloman v. Mail-Well Corp. , 2005 WL 6104099 (N.D. Ga. Jan. 24, 2005), in which the *1272 district court ruled that a de novo standard is appropriate for top hat plans. Defendant has placed all of its eggs in the administrative exhaustion basket and has not offered any substantive response in opposition to Plaintiffs' summary judgment motion.
1. Governing Legal Principles
SERP is a "top hat" plan under ERISA. A top hat plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). "Top hat plans are subject to ERISA, 29 U.S.C. § 1003(a), but ... are excluded from many individual ERISA provisions on the basic assumption that high-level employees are in a "strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees." Holloman v. Mail-Well Corp. , 443 F.3d 832, 837 (11th Cir. 2006) (quoting Goldstein v. Johnson & Johnson , 251 F.3d 433, 442 (3d Cir. 2001) ). "Top hat" plans are exempt from ERISA's participation and vesting provisions, 29 U.S.C. §§ 1051 - 1061, funding provisions, 29 U.S.C. §§ 1081 - 1086, and fiduciary responsibility provisions, 29 U.S.C. §§ 1101 - 1114. See 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). However, "top hat" plans are subject to ERISA's reporting and disclosure provisions, 29 U.S.C. §§ 1021 - 1031, and administration and enforcement provisions, 29 U.S.C. §§ 1131 - 45. Maynard v. Merrill Lynch & Co., Inc. , 2008 WL 4790670, at *11 (M.D. Fla. Oct. 28, 2008) ; Demery v. Extebank Deferred Comp. Plan (B) , 216 F.3d 283, 287 (2d Cir. 2000).
Under § 1132 of ERISA, a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A claimant suing under ERISA has the burden of proving entitlement to plan benefits. Horton v. Reliance Std. Life Ins. Co. , 141 F.3d 1038, 1040 (11th Cir. 1998) (internal citation omitted). The nature of the federal action is to equitably enforce the ERISA plan. Blake v. Unionmutual Stock Life Insurance Co. of America , 906 F.2d 1525, 1526 (11th Cir. 1990).
ERISA is silent on which standard of review applies to actions challenging adverse benefit determinations. Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan , 833 F.3d 1299, 1311 (11th Cir. 2016). The Supreme Court has established a framework for determining the proper standard for reviewing ERISA cases. Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ; see also Metro. Life Ins. Co. v. Glenn , 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). In an ERISA benefits denial case, the standard of review for summary judgment depends on whether the administrator had discretion to deny a claim. Alexandra H. , 833 F.3d at 1311. In Firestone Tire & Rubber Co. v. Bruch , the Supreme Court held that "a denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone , 489 U.S. at 115, 109 S.Ct. 948.
Consistent with this directive, the Eleventh Circuit has adopted three standards of review for plan interpretations: de novo, applicable where the plan administrator is not afforded discretion; arbitrary and capricious when the plan *1273 grants the administrator discretion; and heightened arbitrary and capricious when there is a conflict of interest. Buckley v. Metropolitan Life , 115 F.3d 936, 939 (11th Cir. 1997) (citing Marecek v. BellSouth Telecommunications, Inc. , 49 F.3d 702, 705 (11th Cir. 1995) ). For example, under Firestone , if a benefit plan were to give discretion to its administrator or fiduciary to carry out an interpretative task, then the court would defer to that administrator or fiduciary's interpretation on that issue; but if not, the court would review the administrator or fiduciary's decision de novo. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."[19] Firestone , 489 U.S. at 115, 109 S.Ct. 948.
Under Firestone's directive, the Eleventh Circuit established the following "a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions:"
(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
(5) If there is no conflict, then end the inquiry and affirm the decision.
(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.
Alexandra H. , 833 F.3d at 1311-12 ; Blankenship v. Metro. Life Ins. Co. , 644 F.3d 1350, 1355 (11th Cir. 2011).
Circuits have split over the standard of review that a district court should apply to a top hat plan administrator's benefits decision, and the Eleventh Circuit has issued no binding authority on this question. See Holloman v. Mail-Well Corp. , 443 F.3d 832, 837 (11th. Cir. 2006) (noting the uncertainty as to the proper standard for reviewing decisions of a "top hat" plan administrator but declining to decide whether the district court should have applied a deferential standard of review or de novo review). Since top hat plans involve non-fiduciary administrators, circuit courts have disagreed about whether the Firestone standard applies to a district court's review of these plans. Compare Goldstein v. Johnson & Johnson , 251 F.3d 433, 442-43 (3d Cir. 2001) (explaining that since "a top hat plan is a unique" in that it is exempt from ERISA's fiduciary provisions, the ordinary Firestone standard does not apply; instead holding that top *1274 hat plans are "treated as unilateral contracts" and reviewed "de novo, according to the federal common law of contract" and without regard to whether administrative "discretion" is "explicitly written into" the plan) and Craig v. Pillsbury Non-Qualified Pension Plan , 458 F.3d 748, 752 (8th Cir. 2006) (adopting a similar unilateral-contract approach, but noting that even under de novo review the court was required to "ultimately ... determine whether the Plan's decision was reasonable") with Comrie v. IPSCO, Inc. , 636 F.3d 839, 842 (7th Cir. 2011) (reasoning that "Firestone tells us that a contract conferring interpretive discretion must be respected" and that since top hat plans lack fiduciary administrators, "[i]t is easier, not harder ..., to honor discretion-conferring clauses in contracts that govern the actions of [these] non-fiduciaries") and Sznewajs v. U.S. Bancorp Amended & Restated Supp. Benefits Plan , 572 F.3d 727, 733 (9th Cir. 2009) (applying Firestone standard of review to top hat plans but adding an additional analysis for structural conflicts of interest when the plan administrator both determines eligibility for benefits and pays those benefits), overruling on other grounds noted by Salomaa v. Honda Long Term Disability Plan , 642 F.3d 666, 673-74 (9th Cir. 2011).
However, the Eleventh Circuit, along with the First, Second, and Fourth Circuits, has concluded that there is no material difference between the potentially applicable standards of review, because they each call for an examination of the reasonableness of the Plan Administrator's determination. Holloman v. Mail-Well Corp. , 443 F.3d at 837 (11th Cir. 2006) ("Because all of the questions in this case turn on interpretation of what the plain terms of the plans permit and require, the results would be precisely the same under either standard of review."); Plotnick v. Computer Sciences Corporation Deferred Compensation Plan For Key Executives , 875 F.3d 160, 165-66 (4th Cir. 2017) "(Because, on the facts presented here, we agree that the competing standards of review present a distinction without a difference, we decline to decide which standard of review applies.... Whether we proceed under a "reasonableness" inquiry, an abuse-of-discretion standard, or even de novo review, we agree that the 2012 Amendment and CSC's denial of benefits were valid."); Niebauer v. Crane & Co., Inc. , 783 F.3d 914, 923-24 (1st Cir. 2015) (noting that for cases in which the plan grants discretionary powers to its administrator, applying the Firestone standard (as opposed to a contract-based standard) creates a distinction without a difference); Am. Int'l Grp., Inc. Amended & Restated Exec. Severance Plan v. Guterman , 496 F. App'x 149, 151 (2d Cir. 2012) ; Maynard , 2008 WL 4790670, at *13, n. 137 ("Because the decision violates the plain terms of the Plan, the parties' dispute about the degree of deference, if any, the decision enjoys requires no discussion.")
Under the de novo standard the court determines whether the claim administrator's benefits-denial decision is "wrong." Alexandra H. , 833 F.3d at 1311-12. A decision is wrong if, after reviewing the plan documents, disputed terms, and administrative record de novo, the court disagrees with the administrator's plan interpretation. Id. ; HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co. , 240 F.3d 982 (11th Cir. 2001). When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard, "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett v. Blue Cross and Blue Shield of Ala., Inc. , 890 F.2d 1137, 1139 (11th Cir. 1989) ;
*1275 Luton v. Prudential Ins. Co. of Am. , 88 F. Supp. 2d 1364, 1374 (S.D. Fla. 2000). There is no substantive difference between the "arbitrary and capricious" and "abuse of discretion" standards. See Paramore v. Delta Air Lines, Inc. , 129 F.3d 1446, 1450 n. 2 (11th Cir. 1997) ; Brown v. Blue Cross and Blue Shield of Alabama, Inc. , 898 F.2d 1556, 1558 n. 1 (11th Cir. 1990) (equating arbitrary and capricious standard as interchangeable with abuse of discretion standard).
While ERISA itself offers no guidance as to how courts should interpret provisions of an employee welfare benefits plan, it is well established that federal courts "have the authority to develop a body of federal common law" to govern the interpretation and enforcement of benefit plans in ERISA cases.[20] Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan , 833 F.3d 1299, 1306-07 (11th Cir. 2016) (citing Tippitt v. Reliance Standard Life Ins. Co. , 457 F.3d 1227, 1234-35 (11th Cir. 2006) ); see also Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ; Pilot Life Ins. Co. v. Dedeaux , 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).
The Court must first look to the language of the plan terms to interpret the contract. Alexandra H. , 833 F.3d at 1307 (citing Smith v. Cont'l Cas. Co. , 616 F.Supp.2d at 1296 ) (citing Bedinghaus v. Modern Graphic Arts , 15 F.3d 1027, 1029-30 (11th Cir. 1994) ); see also Billings v. UNUM Life Ins. Co. of Am. , 459 F.3d 1088, 1094-95 (11th Cir. 2006). Contract terms in ERISA policies that are not specifically defined are interpreted according to their "plain and natural" meanings as construed by the average person. See Alexandra H. , 833 F.3d at 1307 ; Bedinghaus , 15 F.3d 1027, 1029-30 (11th Cir. 1994). "When plan documents unambiguously address the substantive rights of the parties at issue, the plan language controls." Meadows ex rel. Meadows v. Cagle's, Inc. , 954 F.2d 686, 691 (11th Cir. 1992) ; Holloman v. Mail-Well Corp. , 443 F.3d 832, 839 (11th Cir. 2006). The terms of the plans take precedence over oral interpretations of the plan language offered by employees of the Company. Holloman , 443 F.3d at 839 (holding that participant could not rely on assurances the plan participant may have received from HR department of his employer); Meadows ex rel. Meadows , 954 F.2d at 691 ; Alday v. Container Corp. of Am. , 906 F.2d 660, 666 (11th Cir. 1990) (holding that where the plan document unambiguously set out the rights of the parties, there is no need to refer to other communications between the parties to determine the parties' intent, and the terms *1276 of the SPD are controlling and other documents must be ignored). Although the oral representations of a plan administrator cannot alter or change the terms of the plan, Nachwalter v. Christie , 805 F.2d 956, 960-61 (11th Cir. 1986), oral interpretations of ambiguous written plan provisions may estop an insurer from later denying its earlier interpretation of a particular plan provision. Kane v. Aetna Life Ins. , 893 F.2d 1283, 1285-86 (11th Cir. 1990), cert. denied , 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) ; cf. National Companies Health Benefit Plan v. St. Joseph's Hospital of Atlanta , Inc., 929 F.2d 1558, 1571-72 (11th Cir. 1991) (allowing application of federal common law estoppel to representations about COBRA rights statutorily included in all ERISA-covered plans).
A term is ambiguous if it is susceptible to two or more reasonable interpretations that can be fairly made. Alexandra H. , 833 F.3d at 1307 ; Novak v. Irwin Yacht & Marine Corp. , 986 F.2d 468, 472 (11th Cir. 1993) ; Luton , 88 F.Supp.2d at 1370-71 (citing Dahl-Eimers v. Mutual of Omaha Life Ins. Co. , 986 F.2d 1379 (11th Cir. 1993) ). If a plan term is ambiguous, the court applies the federal common law rule of contra proferentem requiring that any ambiguity in an ERISA plan is to be construed against the drafter. Alexandra H. , 833 F.3d at 1307 ; Billings , 459 F.3d at 1095 ; Jones v. Am. Gen. Life and Acc. Ins. Co. , 370 F.3d 1065, 1070 (11th Cir. 2004) ; Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala. , 41 F.3d 1476, 1481 (11th Cir. 1995) ; Lee v. Blue Cross/Blue Shield of Ala. , 10 F.3d 1547, 1551 (11th Cir. 1994). Thus, if both the plaintiff and the administrator propose reasonable interpretations of the plan, which result in an ambiguity, then, pursuant to the doctrine of contra proferentem, the plan will be construed against the administrator and the administrator's interpretation will be deemed to be de novo wrong. See Lee , 10 F.3d at 1551 ; Florence Nightingale Nursing Serv., Inc. , 41 F.3d at 1481 ; Epolito v. Prudential Ins. Co. of Am. , 737 F. Supp. 2d 1364, 1373 (M.D. Fla. 2010).
"Breach of contract principles, applied as a matter of federal common law, govern disputes arising out of 'top hat' plan documents, and top hat plans should be interpreted in keeping with the principles that govern unilateral contracts." Maynard , 2008 WL 4790670, at *12 ; (quoting Kemmerer v. ICI Americas Inc. , 70 F.3d 281, 287 (3rd Cir. 1995) ); see also Carr v. First Nat'l Bank , 816 F. Supp. 1476, 1492 (N.D. Cal. 1993) ; Hooven v. v. Exxon Mobil Corp. , 465 F.3d 566, 573 (3d Cir. 2006) (stating that unilateral contract principles apply "only where 'the asserted unilateral contract is based on the explicit promises in the ERISA plan documents themselves' "). In short, a "top hat" plan "is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years." Maynard , 2008 WL 4790670, at *12 ; Kemmerer , 70 F.3d at 287 (quoting Pratt v. Petroleum Prod. Mgmt. Employee Sav. Plan. , 920 F.2d 651, 661 (10th Cir. 1990) ); see also Carr , 816 F. Supp. at 1488. Although exempt from ERISA's accrued benefit anti-cutback rule, a "top hat" plan may not be unilaterally amended to impair rights vested under the terms of the plan. Maynard , 2008 WL 4790670, at *12 (citing Cogan v. Phoenix Life Ins. Co. , 310 F.3d 238, 242 (1st Cir. 2002) ).
2. Whether the Plan Administrator's Interpretation of "Eligible Spouse" Was Reasonable
Factors that shed light on whether there was a reasonable basis for the *1277 Plan Administrator's decision include: (1) whether the plan administrator's interpretation is contrary to the clear terms of the plan; (2) whether the plan administrator has interpreted the terms uniformly; (3) whether the interpretation of the Plan is reasonable and a fair reading of the Plan; (4) whether the interpretation took into consideration the future financial health of the plan; (5) whether the interpretation renders language in the Plan meaningless or internally inconsistent; (6) whether the plan interpretation complies with governing regulations; and (7) the factual background of the decision, including any indicia of bad faith. Cagle v. Bruner , 112 F.3d 1510, 1518 & n.6 (11th Cir. 1997) (delineating factors two through seven); Dennard v. Richards Grp., Inc. , 681 F.2d 306, 314 (5th Cir. 1982) (explaining that, "[w]hen the trustee's interpretation of a plan is in direct conflict with express language in a plan, this action is a very strong indication of arbitrary and capricious behavior"); Guy v. Se. Iron Workers' Welfare Fund , 877 F.2d 37, 39 (11th Cir. 1989) (fair reading).
Courts have recognized that a plan interpretation is arbitrary and capricious when the plan administrator "construe[s] provisions of a plan in a way that clearly conflicts with the plain language of the Plan," when the interpretation "renders nugatory other provisions of the Plan," and when the Plan administrator's construction of the provision "lacks any rational nexus to the primary purpose" of the Plan. Bryant v. Cmty. Bankshares, Inc. , 265 F. Supp. 3d 1307, 1324 (M.D. Ala. 2017) (quoting Tapley v. Locals 302 & 612 of the Int'l Union of Operating Eng'r-Emp'rs Constr. Indus. Ret. Plan , 728 F.3d 1134, 1139 (9th Cir. 2013) (internal citations, brackets, and quotation marks omitted)), aff'd , 736 F. App'x 841 (11th Cir. 2018). Additionally, "[a] decision is arbitrary and capricious if it was made in bad faith, not supported by substantial evidence, or is erroneous on a question of law." Acree v. Hartford Life & Acc. Ins. Co. , 917 F.Supp.2d 1296, 1310 (M.D. Ga. 2013). And, as one circuit put it, "[i]n some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." Bryant , 265 F. Supp. 3d at 1324 (citing Hess v. Hartford Life & Acc. Ins. Co. , 274 F.3d 456, 461 (7th Cir. 2001) ).
ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), which serves the important purpose of enabling an employee to determine "exactly what his rights and obligations are under the plan." Curtiss-Wright Corp. v. Schoonejongen , 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (quoting H.R.Rep. No. 93-1280, p. 297 (1974) U.S. Code Cong. & Admin. News pp. 4639, 5077, 5078); Bryant v. Cmty. Bankshares, Inc. , 736 F. App'x 841, 845-46 (11th Cir. 2018). The plan administrator must analyze whether a benefit is payable under the terms of the plan without importing an additional definition or different requirements. Florence Nightingale Nursing Service, Inc. v. Blue Cross , 41 F.3d 1476, 1483-84 (11th Cir. 1995) (Blue Cross's Assistant Medical Director and chief claims evaluator never actually analyzed the elements of "medically necessary" listed in the plan, but rather injected a pre-certification definition not mentioned in the plan); Bryant , 265 F. Supp. 3d at 1324.
Here the Plan gives the Plan Administrator discretion to make interpretations of plan provisions and benefit determinations. Under Article III(1) of SERP, all "determinations, interpretations and actions by the Plan Administrator under the Plan or with respect to any benefits thereunder *1278 shall be made subject to the sole discretionary authority of the Plan Administrator." Article III(3)(a) gives the Plan Administrator the power "to construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits," under the Plan. Under Article III(4) the Plan Administrator "shall have no power to add to, subtract from or modify any of the terms of the Plan, or to change or add to any benefits provided by the Plan, or to waive or fail to apply any requirement of eligibility to receive a benefit under the Plan." However, Article XII provides that the Compensation and Human Resource Committee of the NCR Corporation Board of Directors ("the Committee"):[21]
shall have the right, without the consent of any Participant, former Participant, Eligible Spouse or any other person claiming under or through a Participant or former Participant, to amend or modify the Plan or any agreement between NCR and any Participant thereunder from time to time or to terminate or repeal the Plan or any such agreement entirely at any time; provided, however, that (a) no such action shall adversely affect any Participant's, former Participant's, or Eligible Spouse's accrued benefits prior to such action under the Plan ... and (b) no amendment may be made, to the extent it would result in a material modification .. of the benefit of any Participant or former Participant.
The Eligible Spouse of a Participant or former Participant is entitled to an annual spousal death benefit under Article IX of SERP. The plan defines "Eligible Spouse" as "the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence." (Article I.) For purposes of this case, a Participant's benefit payments under the Plan commence at the time of his retirement. (See Article VII (providing, inter alia , that a Participant "who retires at or after his or her 62nd birthday" or "who retires or terminates employment on or after his or her 55th birthday and prior to his or her 62nd birthday" is "entitled to receive benefits under the plan in an annual amount ..." in various specified amounts).)
At the risk of sounding like a broken record, the term "Eligible Spouse" is defined under Article I of SERP to mean "the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence." (Article I.) Under this definition, the only qualification for eligibility is that the spouse be married to the participant on the date his benefits commence. The provisions of Article IX determine whether an Eligible Spouse is entitled to benefits under the Plan and proscribe certain limitations on benefit eligibility, none of which include divorce. For example, under Article IX "no benefits are payable to an Eligible Spouse," in the event of the death of a participant who was involuntarily terminated prior to his 52nd birthday, the participant's employment was terminated for reasons other than death or disability, or the participant was discharged by NCR for fraud or misconduct.
Nonetheless, after NCR terminated the plans, the Plan Administrator adopted an interpretation of "Eligible Spouse" as "the spouse (if any) who is married to the participant both on the date that benefits commence, and on the date of the participant's death, or, if earlier, February 25, 2013." (12-5 at 37; 23-2 at 41.) Plaintiffs assert that the Plan Administrator's interpretation is contrary to the Plan language. According to Plaintiffs, the term "Eligible *1279 Spouse" means exactly what it says. While the term "Eligible Spouse" might be ambiguous standing alone, the definition of the term in the plan is not ambiguous: an Eligible Spouse is the spouse of the Participant on the day he beings to receive retirement benefits. Plaintiffs' interpretation of the term "Eligible Spouse" is reasonable, as it follows the literal terms of the plan's definition.
The Plan Administrator's interpretation is not reasonable. The Plan Administrator rationalized that its interpretation "is correct, because the starting point of the definition of Eligible Spouse is the Participant's 'spouse,' which the Plan Administrator has determined is best read as denoting current spousal status as of the participant's death (or February 25, 2013, if earlier), the date on which any spousal rights to a death benefit ripen." (Doc. 12-5 at 37; 23-2 at 41.) But this reasoning is directly contrary to the Plan's language which ties the spouse's eligibility to a single point in time. To qualify for the spousal death benefit under the express terms of the Plan, the only date that matters for eligibility is the date on which the Participant's benefits commenced. "[T]he date on which any spousal rights to a death benefit ripen" is irrelevant under the express terms of the Plan. To qualify for the spousal death benefit under the Plan Administrator's interpretation of "Eligible Spouse," in addition to being married on the date a Participant's benefits commenced, spouses were required to remain married until their husbands died, or until February 25, 2013, the date NCR terminated the SERP. If NCR wanted to limit Eligible Spouse rights to spouses who were married to the participant both on the date benefits began and on the date of the participant's death (or the date the plan was terminated), NCR could have included such language in the plan when it was drafted. It did not. The Plan Administrator has impermissibly and unilaterally appended an additional requirement beyond what the Plan provides that adversely impacts the Plan's beneficiaries. See Florence Nightingale Nursing Service, Inc. , 41 F.3d at 1483-84 ("A claims administrator's decision is arbitrary and capricious where new requirements for coverage are added to those enumerated in the plan."); Helms v. Monsanto Company, Inc. , 728 F.2d 1416, 1420 (11th Cir. 1984) (holding a claims administrator's denial of disability benefits was arbitrary and capricious where he read a requirement of "no conscious life" into a plan definition of "total disability"). The Plan Administrator's interpretation constitutes a material modification to the terms of the Plan that adversely impacts the expectations of beneficiaries who reasonably relied on the express language of the plans when they may have made decisions on their marital property division of at the end of their marriages. See Bryant , 736 F. App'x at 846 (the plan documents enable the employee to determine "exactly what his rights and obligations are under the plan") (quoting Curtiss-Wright Corp. , 514 U.S. at 83, 115 S.Ct. 1223 (quoting H.R.Rep. No. 93-1280, p. 297 (1974) U.S. Code Cong. & Admin. News pp. 4639, 5077, 5078); Maynard , 2008 WL 4790670, at *12 (stating that a "top hat" plan may not be unilaterally amended to impair rights vested under the terms of the plan).
Plaintiffs' and the Court's interpretation of the Eligible Spouse provision is entirely consistent with other courts' analysis of joint and survivor annuity benefits under ERISA. As the Fourth Circuit explained in Hopkins v. AT & T Global Information Solutions, Co. ,
[A]fter carefully reviewing the overall framework of ERISA, especially the *1280 provisions governing joint and survivor annuities, we conclude that the Surviving Spouse Benefits vest in the participant's current spouse on the date the participant retires. When ERISA was initially enacted in 1974, Surviving Spouse Benefits were payable to the surviving spouse only if the surviving spouse was married to the participant on both the date of the participant's retirement and the date of the participant's death. See 26 C.F.R. § 1.401(a)-11(d)(3)(i), (ii), (iii) (1977). In 1984, however, the Retirement Equity Act (REA) amended ERISA's marriage requirement. Now, Surviving Spouse Benefits may be paid to a spouse who was married to the participant on the date of the participant's retirement, regardless of whether that spouse is married to the participant on the date of the participant's death. See 29 U.S.C.A. §§ 1055(a) and 1055(f) (noting that the joint and survivor annuity, with its Surviving Spouse Benefits, is the automatic form of payment for a participant who is married on the date of retirement). We find that the change in ERISA's marriage requirement is evidence that the Surviving Spouse Benefits vest in the spouse married to the participant on the date of retirement.
105 F.3d 153 (4th Cir. 1997) ; see also , e.g., VanderKam v. VanderKam , 776 F.3d 883, 888 (D.C. Cir. 2015) (Congress was concerned "not only for surviving spouses, but also for "spouse[s] and dependent children in the event of divorce or separation," and thus "made annuities payable to surviving spouses so long as the spouse was married to the participant at the time of retirement - regardless of marital status at the time of the participant's death"). Although they are not binding here because top hat plans are exempt from ERISA's mandatory joint and survivor annuity provisions,[22] these cases are persuasive because NCR elected to provide such a benefit in the SERP, and the plan's literal definition of Eligible Spouse mirrors that language of the joint and survivor annuity rules and regulations. See 26 C.F.R. § 1.401(a)-20A-25(b)(3) ("If a participant dies after the annuity starting date, the spouse to whom the participant was married on the annuity starting date is entitled to the QJSA protection under the plan. The spouse is entitled to this protection (unless waived and consented to by such spouse) even if the participant and spouse are not married on the date of the participant's death, except as provided in a QDRO.")
After reviewing the terms of the Plan and the administrative record, the Court disagrees with the Plan Administrator's interpretation that a spouse who was married to a SERP participant when his benefits commenced, but was no longer married to him on the date of the plan termination is not an Eligible Spouse entitled to the survivor annuity under the plan. Nothing in the Plan language requires the additional requirement that the spouse remain married to the participant after his retirement in order to receive the spousal death benefit. Here the plan term at issue is unambiguous, and the Plan Administrator's interpretation differs from the unambiguous meaning. Therefore, the Plan Administrator's interpretation is unreasonable, and the decision to deny benefits was erroneous, arbitrary and capricious, and an abuse of discretion.
As Plaintiffs Patricia Giering and Nancy Parin were married to participants in the SERP when those participants retired and their benefit payments under the plan commenced, under SERP's unambiguous terms Patricia Giering and Nancy Parin *1281 are "Eligible Spouses" entitled to the additional lump sum payment for the spousal death benefit under Article IX. Accordingly, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment [Doc. 87] on Count III.
VI. CONCLUSION
It is unclear whether class discovery is ongoing in this case. Accordingly, the parties are DIRECTED to contact the Court NO LATER THAN APRIL 15, 2019 to schedule a status conference with the Court NO LATER THAN MAY 10, 2019 . The parties should be prepared to discuss the status of discovery, any outstanding discovery, any pending discovery disputes, and a schedule for motions on the class claims or for trial.
IT IS SO ORDERED this 29th day of March, 2019.

Neil Sedaka's "Breaking Up Is Hard to Do" hit number one on the Billboard Hot 100 on August 11, 1962.

"D-I-V-O-R-C-E" is an American country music song written by Bobby Braddock and Curly Putman, and made famous by Tammy Wynette. Wynette's version was a number one country hit in 1968.

A top hat plan is a nonqualified plan under ERISA "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" (29 U.S.C. § 1051(2) ).

The Court notes that the Defendant here is the Plan Administrator of the Plans of NCR Corporation. For ease of reference, the Court will refer to Defendant and NCR Corporation interchangeably.

Defendant's motion failed to explain what was objectionable about the minor additions to the allegations. After being called out by Plaintiffs, Defendant filed a reply setting forth specific objections to the additions. The Court will not consider these arguments raised for the first time in the reply. See, e.g., Conn. State Dental Ass'n v. Anthem Health Plans, Inc. , 591 F.3d 1337, 1352 n.11 (11th Cir. 2009) (treating argument as waived where it was raised for first time in reply brief); Lovett v. Ray , 327 F.3d 1181, 1182 (11th Cir. 2003) (declining to consider argument raised for first time in reply brief); United States v. Georgia Dep't of Nat. Res. , 897 F. Supp. 1464, 1471 (N.D. Ga. 1995).

The Court views the evidence in the record in the light most favorable to the non-moving party and resolves all factual disputes in the non-moving party's favor as required on a motion for summary judgment. See Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Indeed, the Prenuptial Agreement between Allan Quick and Nancy Parin provides that "the parties have agreed to marry on January 28, 1995, which is prior to Quick's retirement date, solely so that Parin's survivor benefit rights provided in this Agreement may vest prior to Quick's retirement ..." (Doc. 23-1 at 19.) The Prenuptial Agreement further provides that "Parin, should she be the surviving party, shall be entitled to all the retirement benefits for the surviving spouse of Quick, as described in Article IX of the NCR Senior Executive Retirement, Death & Disability Plan, which retirement benefits are, if Quick were to become deceased as of February 1, 1995, the approximate sum of $7,000 per month to Parin for her life ... As Quick's spouse on the date of Retirement, Parin is entitled to the monthly retirement benefits described above." (Id. at 17-18.)

According to their divorce decree, Quick and Parin were married on January 28, 1995, separated on August 25, 1995, and divorced on November 28, 1995. (See Doc. 23-1.)

Sandra Black is the former spouse of Darrell Clark, a participant in SERP. (Pls.' Resp. to Def.'s SMF ¶ 5.) Sandra Black and Darrell Clark were divorced on March 1, 1996. (Ex. 4 to Jacob Decl. at 4.) Darrell Clark submitted a benefit claim stating that his former Spouse, Sandra Black, was entitled to receive an Additional Lump Sum Payment as an Eligible Spouse under SERP. (Id. ) Clark relied on a letter from Julie Gallagher of NCR on November 2, 1995, informing Clark that his spouse is entitled to a surviving spouse annuity "whether or not you are still married to each other at the time of your death." (Id. )

Kathy Mays is the former spouse of Thomas Mays, a participant in SERP. (Pls.' Resp. to Def.'s SMF ¶ 6.) Thomas Mays relied on an email from Julie Gallagher dated September 22, 2003 in support of his claim that his former spouse is entitled to an Additional Lump Sum payment. (Ex. 4 to Jacob Decl. at 4.) The Gallagher email states that "[w]e consider the spouse benefit inalienable, regardless of what is in the divorce decree. It became her vested benefit at the time your retirement commenced." (Pls.' Ex. A, Doc. 88-1.)

A joint and survivor annuity provides lifetime monthly payments to the participant's spouse following the death of the participant receiving benefits. The "joint & survivor annuity" is the death benefit paid to the surviving eligible spouse under Article IX of SERP.

Nothing in the letter explains when the spouse's signature would be "applicable," i.e. required to confirm eligibility for benefits.

Giering also argued that:
The Plan Administrator's decision that I am not eligible for the Additional Lump Sum Payment under the Eligible Spouse provision violates the terms of the Plan, Is made In bad faith and is an abuse of discretion.
(Id. at 27.)

Quick explained "[t]his can be viewed as payout for the alimony that has been placed in jeopardy by the termination of the SERP. The Participant can then negotiate a modification of the court ordered alimony." (Doc. 12-5 at 9.)

In addressing Defendant's argument that Plaintiff Allan Quick had not exhausted at the administrative level the claim asserted in Count III challenging the interpretation of "Eligible Spouse," this Court found that further administrative would be futile because the Plan Administrator justified denial of Mr. Quick's claims based in on its uniform interpretation of the term "Eligible Spouse," both when considering the initial claim and subsequent appeal.

As explained below, the Court finds the Plan Administrator's interpretation is unreasonable and contrary to the express language of the plan.

Clark relied on a letter from Julie Gallagher of NCR on November 2, 1995, informing Clark that his spouse is entitled to a surviving spouse annuity "whether or not you are still married to each other at the time of your death." (Ex. 4 to Jacob Decl.). Mays relied on a September 22, 2003 email from Julie Gallagher stating that "[w]e consider the spouse benefit inalienable, regardless of what is in the divorce decree. It became her vested benefit at the time your retirement commenced." (Id. ; Pls.' Ex. A, Doc. 88-1.)

Plaintiffs also filed, in response to Defendant's Cross-Motion, a Conditional Rule 56(d) Motion asking that the Court permit Plaintiffs to depose a 30(b)(6) witness regarding NCR's administrative processes relating to spousal benefits in the event the Court were inclined to rule in NCR's favor on the administrative exhaustion issue. Accordingly, as the Court has denied Defendant's Cross-Motion, the Court DENIES AS MOOT Plaintiff's Conditional Rule 56(d) Motion [Doc. 106].

Where the Plan Administrator is both evaluating claims for benefits and paying benefits under the plan, a conflict of interest is presumed, and the heightened arbitrary and capricious standard applies. See Metropolitan Life Ins. Co. v. Glenn , 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) ; Brown v. Blue Cross and Blue Shield of Ala., Inc. , 898 F.2d 1556, 1561 (11th Cir. 1990).

In deciding whether to adopt a certain rule into the federal common law, courts must examine whether the proposed rule would further ERISA's scheme and goals. Alexandra H. , 833 F.3d at 1307 ; Dixon v. Life Ins. Co. Of N. Am. , 389 F.3d 1179, 1183 (11th Cir. 2004). "ERISA has two central goals: (1) protection of the interests of employees and their beneficiaries in employee benefit plans; and (2) uniformity in the administration of employee benefit plans." Horton v. Reliance Standard Life Ins. Co. , 141 F.3d 1038, 1041 (11th Cir. 1998) (internal citations omitted). "When crafting a body of common law, federal courts may look to state law as a model because of the states' greater experience in interpreting insurance contracts and resolving coverage disputes." Id. ; Hauser v. Life Gen. Sec. Ins. Co. , 56 F.3d 1330, 1333 (11th Cir. 1995), as amended on denial of reh'g (Sept. 15, 1995). Borrowing from state contract law, the courts have further developed rules of contract interpretation for construing ERISA plans. Alexandra H. , 833 F.3d at 1307 (citing Epolito v. Prudential Ins. Co. of Am. , 737 F. Supp. 2d 1364, 1373 (M.D. Fla. 2010) ; Smith v. Cont'l Cas. Co. , 616 F. Supp. 2d 1286, 1296 (N.D. Ga. 2007) ; Luton v. Prudential Ins. Co. of Am. , 88 F. Supp. 2d 1364, 1370-71 (S.D. Fla. 2000) ; Harrison v. Aetna Life Ins. Co. , 925 F. Supp. 744, 748-49 (M.D. Fla. 1996) ).

The "Plan Administrator" is defined as the Committee. (See Article I.)

See Hollingshead v. Burford Equip. Co. , 747 F. Supp. 1421, 1429 (M.D. Ala. 1990).